## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| Ash-har Quraishi, Marla Cichowski and Sam Winslade, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| St. Charles County, Missouri, | ) **Case No. 16-cv-1320** |
| and | ) ) **Jury Trial Demanded** |
| Deputy Michael Anderson, in his individual capacity, | ) ) ) |
| Defendants. | ) ) |

## FIRST AMENDED COMPLAINT

*"And here, in the United States of America, police should not be bullying or arresting journalists who are just trying to do their jobs and report to the American people on what they see on the ground."*

> President Barack Obama, the day after Plaintiffs were shot at and gassed by the St. Charles County Regional SWAT Team

Plaintiffs Ash-har Quraishi, Marla Cichowski and Sam Winslade bring this Civil Rights Complaint against St. Charles County, Missouri and Deputy Michael Anderson, in his individual capacity, to seek redress for the injuries plaintiffs suffered as a result of the actions of the St. Charles County Regional SWAT Team, whose members (1) carried out an unprovoked and unwarranted attack on these award-winning network television journalists, and (2) engaged in a deceitful cover-up of the team's illegal and unconstitutional infringement of plaintiffs' First Amendment rights.

**The Al Jazeera America News Network Covers the Protests in Ferguson**

1.      Following the fatal shooting of Michael Brown in Ferguson, Missouri, on August 9, 2014, the Al Jazeera America television news network—which was headquartered in New York—sent numerous journalists to Ferguson to report on developments in the Brown killing, including the ongoing protest activities.

2.      Among the Al Jazeera America journalists sent to Ferguson were plaintiffs Ash-har Quraishi, Marla Cichowski and Sam Winslade.

3.      Ash-har Quraishi is an Emmy Award-winning journalist and in August 2014 was the chief correspondent for Al Jazeera America's Chicago news bureau.

4.      Before being employed by Al Jazeera America, Quraishi was Bureau Chief of CNN's Islamabad, Pakistan news bureau.

5.      Quraishi is a citizen of the United States and is a resident of Illinois.

6.      Marla Cichowski is a graduate of the University of Missouri School of Journalism and in August 2014 was a Field Producer for Al Jazeera America's Chicago news bureau.

7.      Before being employed by Al Jazeera America, Cichowski was a Field Producer for the national television news network Fox News for more than seven years.

8.      Cichowski is a citizen of the United States and is a resident of Illinois.

9.      Sam Winslade is an Emmy Award-winning photojournalist and in August 2014 was a photojournalist for Al Jazeera America's Chicago news bureau.

10.     Winslade is a citizen of New Zealand, a lawful permanent resident of the United States and is a resident of New Jersey.

**The News Crew Observes the St. Charles County Regional SWAT Team**

11.     On the evening of Wednesday, August 13, 2014, Quraishi, Cichowski and Winslade drove their SUV to the command center which the police had established in the parking lot of the Buzz Westfall Plaza shopping center at the intersection of West Florissant Avenue and Lucas & Hunt Road in Jennings, St. Louis County, Missouri.

12.     At 5:40 p.m. Central Time, Quraishi, Cichowski and Winslade observed—and Winslade recorded—the St. Charles County Regional SWAT Team depart the command center in its Lenco Bearcat armored vehicle, which is identifiable by the "SHERIFF" name and the "LENCO" nameplate on the grille; the "ST. CHARLES COUNTY REGIONAL SWAT" shield on the vehicle's front doors; and the Long Range Acoustic Device ("LRAD") on the vehicle's roof, as shown in this screenshot. (Note: the video timestamp is shown in Eastern Time).



13.     In addition, the Bearcat has the name "ST. CHARLES COUNTY REGIONAL SWAT" on the vehicle's sides, as shown in this screenshot.



14.     At the same time, the St. Louis County Police Department's Tactical Operations Unit's own Bearcat armored vehicle—which is identifiable by its distinctive elevated platform— was observed leaving the command post, as shown in this screenshot.



15.     The St. Louis County Police Department's Tactical Operations Unit's Lenco Bear armored vehicle was also observed leaving the command center, as shown in this screenshot.



16.     From the command center, both the St. Charles County Regional SWAT Team and the St. Louis County Police Department's Tactical Operations Unit proceeded to the intersection of West Florissant Avenue and Canfield Drive, in Ferguson, Missouri.

### The SWAT Team and the Tactical Unit Establish a Perimeter

17.     Once there, the St. Charles County Regional SWAT Team and the St. Louis County Police Department Tactical Unit used their armored vehicles to block access to West Florissant Avenue and to establish the northern perimeter of the protest zone.

18.     Combined, the St. Charles County Regional SWAT Team and the St. Louis County Police Department Tactical Unit deployed dozens of heavily-armed officers in military-styled camouflage fatigues and helmets, as seen in this news photo, in which the SWAT Team's Bearcat (with its distinctive LRAD dish) is shown on the right.



19.    In addition, police sharpshooters on top of the armored vehicles took aim directly at the unarmed protestors who had their hands up, as shown in this news photo.



20.     Despite this provocation by the police, the protestors remained peaceful and committed no acts of violence.

### "Trying to Get Good Footage For You"

21.     The St. Charles County Regional SWAT Team—as its name suggests—consists of members of what was at the time the St. Charles County Sheriff's Department (and is now the St. Charles County Police Department), as well as officers from nearby jurisdictions.

22.     In addition, when the SWAT Team deploys it also deploys medics, who are doctors, paramedics or EMTs with the St. Charles County Ambulance District.

23.     On Wednesday, August 13, 2014, one of the medics who deployed with the St. Charles County Regional SWAT Team was Battalion Chief Brandon Jones.

24.     During his deployment that day, Jones was wearing a GoPro HERO3+ Black Edition video camera, which he used to record the SWAT Team's activities.

25.     Shortly after 6:00 p.m. that evening, one of the SWAT Team's Team Leaders approached Jones and advised him that "things were going to get busy."

26.     The Team Leader went on: "They're gonna start gassing people; start pepper-balling. We're not gonna mess around; they're gonna move," he said, referring to the protestors.

27.     The Team Leader gave Jones this heads-up not so that Jones would be prepared in case Jones needed to treat any injuries, but because the Team Leader wanted Jones to be prepared to capture the action on video.

28.     In response to the Team Leader's statement, Jones was recorded on his GoPro camera saying: "I'm trying to get good footage for you."

29.     Far from being the "good footage" the SWAT Team Leader wanted, Jones' footage shows that at the time there were only a handful of idle protestors remaining.



30.     And as can be seen from this enlargement of the video Jones recorded of the street corner where the remaining protestors were standing, none were engaged in rock- or bottle-throwing, or otherwise posed any safety threat to the officers whatsoever.



31.     Despite this fact, shortly thereafter the St. Charles County Regional SWAT Team and the St. Louis County Police Department's Tactical Operations Unit followed through on their plan to shut down the protests by physically dispersing the protestors.

**A Woman is Arrested by the SWAT Team While Calling for CNN**

32.     In the process, more than a dozen officers surrounded an unarmed black woman who was standing next to the curb of an adjoining street, as can be seen in this screenshot from Jones' GoPro video.



33.     As the woman yelled for her son to call CNN, St. Charles County Sheriff's Department Det. Darren Baker, a SWAT Team Leader, and Wentzville Police Officer Jason Davis, another member of the St. Charles County Regional SWAT Team, arrested the woman for apparently not moving fast enough for the officers.

34.     As the two SWAT Team members were dragging the woman away, the plastic handcuffs they had placed on her came off, and she fell to the ground.

35.     While she was laying on the ground, one of the two SWAT Team members said to her: "You should have been more conscious about that before you ran your mouth."



**An Alderman is Arrested for Videotaping the SWAT Team**

36.     As the officers continued to disperse anyone standing outside, the St. Charles County Regional SWAT Team came upon an unarmed black man sitting in a parked car at the intersection of Lang Drive and West Florissant Avenue.

37.     According to the SWAT Team's Offense / Incident Report, "the man in the light colored vehicle remained inside holding up his cell phone in an obvious attempt to video tape the police response."

38.     The man the SWAT Team observed videotaping the police response was St. Louis City Alderman Antonio French, who had been posting video reports of the police response to the protests on his Twitter and Vine social media accounts for several days by this time.

39.     Despite the fact he was inside a parked car, St. Charles County Sheriff's

Department Det. Darren Baker, Lake St. Louis Police Officer Thomas Jones and St. Charles City Police Officer Dean Alexander—all members of the St. Charles County Regional SWAT Team—arrested French at gunpoint, as shown in this screenshot taken from the cell phone video French was recording from inside his car at the time of his arrest.



40.    French was booked as "Inmate No. 14-00603" and charged with Unlawful Assembly in violation of R.S.Mo. § 574.040, which makes it a crime to "assemble[] with six or

more other persons and agree[] with such persons to violate any of the criminal law of this state or of the United States with force or violence."

### "I Can't Breathe, I Can't Breathe"

41. As the contingent of SWAT Team members and other officers continued to move north on West Florissant Avenue, they encountered a single unarmed black man who told police he was walking home from work and was not a protestor.

42. Nevertheless, as captured on video by the SWAT Team medic, St. Charles City Police Officer Paul Yadlosky and St. Charles County Sheriff's Department Deputy Mark Thomas—both members of the St. Charles County Regional SWAT Team—held the man to the ground, while the man repeatedly cried out: "I can't breathe, I can't breathe."



43. A second video—this one taken by a photojournalist for the local St. Louis NBC affiliate, KSDK—shows officers repeatedly beating the black man with the officers' batons while the man was being held down by Officer Yadlosky and Deputy Thomas.



44.     After Jones, the medic, instructed the officers to "get off his back" and to get him "off his chest," Jones examined the man, who was bleeding from his face.



45.     As a result of his examination Jones determined the man had been shot by police.

46.     More specifically, as Jones recorded on his GoPro video at the time: "They shot the shit out of that dude."

**The KSDK Photojournalist Is Shot At While Recording the SWAT Team**

47.     While the medic was attending to the injured black man, the KSDK photojournalist who recorded the beating observed the St. Charles County Regional SWAT Team's Bearcat and the SWAT Team move north on West Florissant Avenue, as shown in this screenshot from video he recorded that night.



48.     Thirty seconds after the KSDK photojournalist filmed the black man being beaten by police, the photojournalist himself was shot at by police, and a police round hit the photojournalist's camera equipment.

49.     At no time before or after the shooting did the police issue any verbal or other instruction or warning of any kind to the photojournalist.

50.     Afraid for his safety, the photojournalist retreated back to his vehicle.

**"God Dammit, We Get Paid for This!"**

51.     Among the members of the St. Charles County Regional SWAT Team who were deployed that evening was St. Charles County Sheriff's Department Captain David Todd.

52.     At the time, Capt. Todd headed the Sheriff's Department's Bureau of Special Enforcement, which included the SWAT Team

53.     Effective January 1, 2015, Capt. Todd became Chief of Police of the newly-constituted St. Charles County Police Department.

54.     Capt. Todd was personally present in Ferguson while his officers were engaged in the acts described above.

55.     Far from showing concern about his officers' actions, Capt. Todd is captured on the medic's GoPro video that night doing the exact opposite, exhorting his fellow officers on, telling another SWAT Team member: "God Dammit, we get paid for this!"



**The Al Jazeera America News Crew Parks Away From the Protests**

56.     Meanwhile, the Al Jazeera America news crew had driven from the command post to the intersection of Highmont Drive and Gage Drive, where they parked their SUV in front of 1358 Highmont Drive, Ferguson, St. Louis County, Missouri.

57.     The intersection of Highmont Drive and Gage Drive is more than a mile from the command center, and is within a residential area—not near any of the commercial areas where the earlier protests had occurred.

58.     A KSDK news crew van was also parked nearby, and a television crew for the documentary program *Fault Lines* was filming a block away.

59.     The location of the three crews, and their vehicles, is shown in this diagram:



60.     Winslade set his video camera on a tripod, facing east toward West Florissant Avenue and began recording at 9:24 p.m.

61.     As evidenced by Winslade's video—which ran continuously while the camera was mounted on the tripod—there were no protestors, or protest activity of any sort, in the area; nor was any criminal activity of any sort occurring.



**The News Crew Observes Police Activity**

62.     A short time later, Quraishi, Cichowski and Winslade observed—and Winslade recorded—police officers a block and a half away, at the intersection of West Florissant Avenue and Highmont Drive.

63.     At first, Quraishi, Cichowski and Winslade were unable to identify the officers, or the officers' vehicle, because shrubs blocked their view.

64.     At 9:25 p.m., however, Winslade focused his camera on two officers who appeared above the shrubs.

65.     One of the officers was wearing the same distinctive boonie hat that Quraishi, Cichowski and Winslade observed when the St. Charles County Regional SWAT Team left the command center in their Bearcat armored vehicle earlier that evening (*see* screenshot in Paragraph 12, above).



66.     At the same time that Winslade was recording these two officers, Eric Voss, a

KSDK photojournalist—who was located across the intersection from Quraishi, Cichowski and

Winslade—was also recording the officers, as shown in this screenshot taken from Voss' video.



67.    Because he had a different line of sight, Voss, the KSDK photojournalist, could see that the two officers were on top of the St. Charles County Regional SWAT Team's Bearcat, which is identifiable by both the team's seal on the driver's side door, and by the "ST. CHARLES COUNTY REGIONAL SWAT" name on the vehicle's side.

68.    From their vantage point on top of the SWAT Team's Bearcat, the two SWAT Team members had an unobstructed view of Quraishi, Cichowski and Winslade.

69.    More specifically, both officers could see—and did in fact see—that Quraishi, Cichowski and Winslade were standing by a video camera mounted on a tripod, along with a series of large, rectangular lights, also mounted on tripods.

70.    As such, Quraishi, Cichowski and Winslade were easily identifiable as a professional television news crew.

71.    In addition, both officers could see—and did in fact see—that Quraishi, Cichowski and Winslade were not engaged in protest activities of any sort, and were neither committing, nor about to commit, any crime.

72.    The two SWAT Team members could also see—and did in fact see—that there were no protestors of any kind in the area, and that no person in the area was committing, or about to commit, any crime.

**Quraishi, Cichowski and Winslade are Shot At by Police**

73.    Despite the fact Quraishi, Cichowski and Winslade were not engaged in any illegal activities, and were not located anywhere near any illegal activity of any kind, at 9:25 p.m., and without warning of any kind, an unknown police officer shot directly at them.

74.    Quraishi, Cichowski and Winslade each immediately began yelling at the police, verbally identifying themselves as members of the news media.

75.    Specifically, Winslade's video records the news crew as yelling:

- "Hey, there's press over here" (Cichowski)

- "This is the media" (Winslade)

- "This is press over here" (Cichowski)

- "This is media over here trying to cover the story" (Cichowski)

76.    Acknowledging that he heard the news crew, one of the officers on top of the SWAT Team's Bearcat used a high-powered spotlight to directly illuminate the news crew, along with their camera equipment, as shown in this screenshot from Winslade's video.



**Quraishi, Cichowski and Winslade are Tear-Gassed by the SWAT Team**

77.    Despite the verbal and visual identification of them as a television news crew, without warning of any kind, thirty-five seconds later, St. Charles County Deputy Michael Anderson fired a 40 mm CS "tear gas" round from his grenade launcher directly at Quraishi, Cichowski and Winslade, leaving a trail of sparks as shown in this sequence of screenshots.



78.    At the same time, the *Fault Lines* crew—which was just north of the Bearcat—recorded the smoke tracer left from Deputy Anderson's firing of the 40 mm CS round from his grenade launcher west down Highmont Drive towards Quraishi, Cichowski and Winslade.



79.     Observing the SWAT Team engaging in what appeared to be random firing into the neighborhood, the *Fault Lines* correspondent, Sebastian Walker, made the excited utterance: "It looks like the police are firing tear gas into these neighborhoods here, you can see the plume of smoke. I just have no idea what they are firing at."

80.     From the vantage point of the *Fault Lines* crew—and the KSDK news crew—it is possible to plot the location of both the SWAT Team and Deputy Anderson when he launched the 40 mm CS round from his grenade launcher toward Quraishi, Cichowski and Winslade.

81.     Specifically, the SWAT Team's Bearcat was stopped in the middle of West Florissant Avenue, just south of Highmont Drive, as shown in this diagram—which shows the location of the SWAT Team, the KSDK news crew, the *Fault Lines* crew, and Quraishi, Cichowski and Winslade, as well as the direction of fire.



82.     Deputy Anderson, who was standing next to the Bearcat armored vehicle (on the driver's side), aimed his grenade launcher directly at Quraishi, Cichowski and Winslade.

83.     The tear gas canister landed and exploded directly in front of the three journalists, and immediately enveloped Quraishi, as seen in this screenshot from Winslade's video.



84.    The gassing was also recorded by Voss, the KSDK photojournalist who was across the intersection, as seen in this screenshot from Voss' video which shows Quraishi in front of the camera, Cichowski beside the camera and Winslade behind the camera.



85.     As the tear gas spread, Quraishi, Cichowski and Winslade were all overcome by the gas and fled, running as fast as they could, a scene captured in this news photo.



**CS Gas (2-chlorobenzylidene malonitrile)**

86.     Quraishi, Cichowski and Winslade were directly hit by a 40 mm CS gas round fired by Deputy Anderson from his grenade launcher.

87.     CS gas (2-chlorobenzylidene malonitrile) is an incapacitating agent which is usually mixed with a dispersal agent, such as methylene chloride.

88.     Direct exposure to CS gas causes intense burning sensations in the throat and nose, eye pain, lacrimation, blepharospasm, increased nasal secretions, chest tightness, decreased heart rate, increased blood pressure, sneezing, coughing, retching, and decreased circulation on the periphery of the body.

89.     As a direct result of their being tear gassed, Quraishi, Cichowski and Winslade each suffered these symptoms.

**Quraishi, Cichowski and Winslade Are Shot At Again by Police**

90.     As Quraishi, Cichowski and Winslade attempted to recover from the effects of being tear gassed, they recognized they had abandoned their camera equipment.

91.     After waiting for the tear gas to clear the immediate area, Quraishi, Cichowski and Winslade approached the camera and, without warning, an unknown police officer shot directly at them.



92.     Fearful for their safety, Quraishi, Cichowski and Winslade again fled to the west and hid from the police in the bushes.

93.     Quraishi called 911 to report that they were being shot at by the police, and to demand that the police stop shooting at them.

94.     Additionally, Winslade called the Al Jazeera America Network Operations Center in New York and asked that someone there call the St. Louis County Police (which had assumed

overall command of the police response in Ferguson) and advise them that the news crew was being fired upon by police.

### The SWAT Team Dismantles the Al Jazeera America Camera Equipment

95.     While Quraishi, Cichowski and Winslade were hiding from the police, the St. Louis County Regional SWAT Team's Bearcat, and a squad of SWAT Team members, turned west onto Highmont Drive and drove directly to the area where the Al Jazeera America news crew had left their camera equipment.

96.     The SWAT Team then approached the area with raised assault rifles while other officers dismantled the Al Jazeera America camera equipment and intentionally aimed the video camera straight down into the ground, as recorded by Voss, the KSDK photojournalist.



### Quraishi, Cichowski and Winslade Are Ordered to Leave

97.     After the police dismantled the Al Jazeera America equipment, the SWAT Team continued west on Highmont Drive.

98.     At this point, Quraishi, Cichowski and Winslade came out of hiding, intending to talk to the officers.

99.     Instead, multiple SWAT Team members pointed raised assault rifles at Quraishi, Cichowski and Winslade and demanded the three journalists get inside the Bearcat.

100.     Quraishi, Cichowski and Winslade feared for their safety—not knowing if these were the same officers who previously shot at them and gassed them—but were coerced into getting into the armored vehicle by multiple officers dressed in military-style camouflage uniforms and helmets who pointed assault rifles at them.

101.     Shortly thereafter the officers ordered Quraishi, Cichowski and Winslade to get out of the Bearcat and ordered them to leave the area immediately, even though the news crew had done nothing wrong and even though the only danger the news crew faced was the danger posed by the police.

102.     As armed SWAT Team members surrounded them, Quraishi, Cichowski and Winslade packed up their equipment and left the area, as they were ordered to do.

103.     While packing up, the SWAT Team deployed additional tear gas rounds for no legitimate reason, which caused Quraishi, Cichowski and Winslade to suffer further injuries.

**The Cover Up Begins**

104.     After the KSDK video of the assault went "viral" the next day, local and national reporters contacted the St. Charles County Sheriff's Department for comment.

105.     To aid him in responding to those media inquiries, Lieutenant Dave Tiefenbrunn, the St. Charles County Sheriff's Department spokesperson, spoke to members of the SWAT Team to learn what happened.

106.    Those SWAT Team members—who previously were unaware of the fact Voss, the KSDK photojournalist, had captured the assault on video—immediately closed ranks and falsely told Tiefenbrunn that the St. Charles County Regional SWAT Team had not gassed the Al Jazeera America news crew.

107.    Mistakenly believing the SWAT Team members had told him the truth, Tiefenbrunn repeatedly responded to media inquiries that day by denying that the St. Charles County Regional SWAT Team had fired the tear gas that hit the Al Jazeera America news crew.

108.    For example, *U.S. News World & Report* reported that "Tiefenbrunn, who spoke with members of the SWAT Team … says his department didn't fire the tear gas."

109.    Similarly, *TheWrap*, a media news website, reported that "Lt. David Tiefenbrunn told *TheWrap* … [t]he St. Charles County Sheriff's Department, which operates the SWAT team, … was not the agency that fired the tear gas Wednesday night."

110.    In each case, Tiefenbrunn based his false denials on information provided to him by members of the St. Charles County Regional SWAT Team who themselves had falsely denied to Tiefenbrunn that they had gassed Quraishi, Cichowski and Winslade.

**The Cover Up Continues**

111.    Later in the afternoon of Thursday, August 14, 2014, as additional media inquiries came into the Sheriff's Department, Colene McEntee, the St. Charles County Public Affairs Coordinator, prepared an official statement for Tiefenbrunn to release.

112.    The statement read as follows:

*Over the last few days, the St. Charles County Regional SWAT Team has assisted in Ferguson at the request of the St. Louis County Police Department to help respond to looting and for protection of the property of Ferguson citizens and*

*businesses. On Wednesday, August 13th, video footage was taken of St. Charles*

*County SWAT officers handling media camera equipment. The position of the St.*

*Charles County Sheriff's Department is that the media has the right to cover these*

*events and supports the freedom of the press, and the SWAT Team has not been*

*any part of attempting to prevent media coverage. In fact, last night the SWAT*

*Team officers were assisting the media in moving their camera equipment and*

*media personnel to a safer area with their consent so that they could continue to*

*cover the event. The Sheriff has notified St. Louis County Police that the St.*

*Charles County Regional SWAT Team is available to protect life and property but*

*does not have a continued role in crowd control during this time of civil protest.*

113.     This formal statement, which as shown below was false and misleading, was still
another step in St. Charles County's effort to cover up its wrongdoing.

114.     To begin with, relying on the SWAT Team's false denial of responsibility for
firing the tear gas, the statement omits any reference whatsoever to the SWAT Team's gassing of
the Al Jazeera America news crew, or the fact the news crew was repeatedly shot at by police.

115.     Instead, the statement falsely claims that the SWAT Team "assist[ed] the media in
moving their camera equipment and media personnel to a safer area with their consent so that
they could continue to cover the event."

116.     The true facts are that the SWAT Team ordered Quraishi, Cichowski and
Winslade to leave—over the news crew's objection—and that the crew was never in danger from
anyone except the police themselves.

117.     The statement also falsely claims that "[t]he position of the St. Charles County
Sheriff's Department is that the media has the right to cover these events and supports the

freedom of the press, and the SWAT Team has not been any part of attempting to prevent media coverage."

118.    The true facts are that after the St. Charles County Regional SWAT Team arrested a woman who wanted her son to call CNN, the woman was told by a SWAT Team member: "You should have been more conscious about that before you ran your mouth."

119.    Additionally, the St. Charles County Regional SWAT Team arrested St. Louis City Alderman Antonio French because, in the words of the SWAT Team's own Offense / Incident Report, he was inside his car "holding up his cell phone in an obvious attempt to video tape the police response."

120.    Moreover, Deputy Anderson, who was both a St. Charles County Sheriff's Deputy and a member of the St. Charles County Regional SWAT Team, intentionally fired a 40 mm CS round at Quraishi, Cichowski and Winslade, knowing that they were part of a news crew.

**The Cover Up Spreads**

121.    Following the assault on Quraishi, Cichowski and Winslade, the SWAT Team prepared an official "Offense / Incident Report" of the incident.

122.    Just as the St. Charles County Sheriff's Department's press statement falsely attempted to divert blame from the SWAT Team, the Offense / Incident Report—which was prepared by St. Peters Police Officer Clayton Alley, a SWAT Team Leader, and approved by St. Charles County Sheriff Sgt. Jeff Ochs, the SWAT Team's Tactical Team Commander—similarly misstates the facts in an attempt to cover up the SWAT Team's illegal actions.

123.    For example, in describing the assault on Quraishi, Cichowski and Winslade, the Offense / Incident Report states:

> *Three bright lights were pointing in the direction of officers from Highmont Drive and Gage Drive, which is located one block west of W. Florissant Avenue. The lights were hindering officer's vision and provided rioters behind the lights concealment. Rocks and bottles were being thrown at the officers from behind the lights. Deputy Anderson 523 stated he observed that objects were being thrown at officers from behind the lights. Since Deputy Anderson could not see what was behind the light and could not safely deploy rounds to that area he deployed a 40mm CS round in front of the lights in hopes the CS gas would drift behind the lights and get the rioters to leave the area. Items were still being thrown at officers from behind the lights after the CS round was deployed.*

124.    This description of the assault is patently false.

125.    The true facts are that the television lights neither hindered officers' vision, nor "provided rioters behind the lights concealment."

126.    As can be plainly seen from Winslade's video—which was mounted on a tripod and continuously recorded the events—there were no "rioters behind the lights."

127.    Equally false is the claim that "Deputy Anderson … observed that objects were being thrown at officers from behind the lights."

128.    Again, the Winslade video documents that no objects were being thrown—either at the officers or otherwise—from behind the camera and the associated television lights.

129.    Instead, Deputy Anderson's statement is an intentional misrepresentation designed to cover up for his illegal action in gassing the news crew.

130.    The report also falsely claims that "[i]tems were still being thrown at officers from behind the lights after the CS round was deployed."

131.    Even after Quraishi, Cichowski and Winslade fled the immediate area after being overcome by tear gas, Winslade's camera continued recording.

132.    That recording confirms that both before and after Deputy Anderson used his grenade launcher to fire a 40 mm CS round directly at Quraishi, Cichowski and Winslade, no items of any sort where being thrown at the officers.

133.    The Offense / Incident Report goes on to misrepresent the facts surrounding the SWAT Team's actions in disassembling the news crew's camera equipment, stating.

> *The bright lights shining in the officers faces was creating a safety concern since officers could not see beyond the lights. Deputy Selsvold 588, Deputy Sykes 625 and P.O. Holmes 337 moved forward and observed the bright lights were two large flood lights on tripods and a video camera with a spot light mounted on top of it. For officer safety purposes they laid the lights on the ground and aimed the camera with the spot light towards the ground.*

134.    The statement that officers "observed … a video camera with a spot light mounted on top of it" and that "[f]or officer safety purposes they … aimed the camera with the spot light towards the ground" is provably false.

135.    As shown in this screenshot from the KSDK video, Winslade's video camera—which officers are pointing to the ground—does not have a "spot light mounted on top of it."

- 32 -



136.    Accordingly, the SWAT Team's claim that it pointed the news camera to the ground for "officer safety purposes" is false—the real reason the SWAT Team pointed the news camera to the ground is the same reason it arrested Alderman French: the SWAT Team did not want anyone video recording its activities.

137.    The false police report continues when it describes its purported rescue of the Al Jazeera America news crew.

> *Minutes later the St. Louis County Command Post advised a crew of journalists*
> *were near the intersection of Highmont Drive and Rand Drive. The journalists*
> *were with Al Jezeera America and were requesting assistance because they were*
> *away from their vehicle and were concerned for their safety due to the nearby*
> *rioter's behavior. The element of SCCRST officers responded to the journalist's*
> *location in the BearCat. The journalist were placed in the BearCat for their safety*
> *and brought back to their vehicle. SCCRST officers provided security for the crew*

*of journalists while they loaded their camera and lighting equipment that was
previously placed on the ground. Once safely in their vehicle the journalists left
the area.*

138.    As noted above, there were no "nearby rioter[s]" and, as such, the claim that the
Al Jazeera America journalists "were requesting assistance because they were away from their
vehicle and were concerned for their safety due to the nearby rioter's behavior" is false.

139.    The true facts are that Quraishi, Cichowski and Winslade feared for their safety
not because of concerns arising from the actions of any protestors, but due solely to the actions
of the police.

140.    And Quraishi, Cichowski and Winslade were fearful of returning to their original
location not due to the actions of any protestors, but due solely to the fact that when they first
tried to return to that location following their gassing, they were again shot at by police.

141.    Equally false is the claim that the SWAT Team "provided security for the crew of
journalists while they loaded their camera and lighting equipment."

142.    The true facts are that SWAT Team members, with raised assault rifles, ordered
Quraishi, Cichowski and Winslade—over their objection—to leave the area immediately,
resulting in Quraishi, Cichowski and Winslade being no longer able to report from the scene.

143.    At the same time, the SWAT Team ordered the KSDK news crew—over their
similar objection—to similarly leave the area immediately, preventing the KSDK news crew
from continuing to report from the scene.

### More False SWAT Team Reports

144.    Along with the Offense / Incident Report, the SWAT Team prepared numerous
other reports, which contained similar false and misleading claims.

145.   For example, the SWAT Team's "Tactical Operations Activity Log"—which was prepared by Officer Alley and approved by Sgt. Ochs—states: "Subjects throwing objects at officers from behind a house and behind a news crew. CS deployed to both areas."

146.   The true facts are that no one was throwing anything at officers from behind Quraishi, Cichowski and Winslade—a fact which is documented by Winslade's video, which was continuously recording the scene.

147.   An unsigned "Synopsis of Events" states that at "2130 [the] Line [of officers] starts taking assault from subjects behind houses and behind media."

148.   The Synopsis continues: "Anderson 523 deploys 2 40mm CS rounds. 1 directed beyond the intersection of Highmont Dr / Gage Drive at a crowd which was throwing rocks, bricks, and bottles at officers."

149.   Again, the true facts are that no rocks, bricks, bottles—or any other objects—were being thrown from the intersection of Highmont Drive and Gage Drive, where Quraishi, Cichowski and Winslade were located.

150.   The Synopsis then goes on to describe the SWAT Team's dismantling of the Al Jazeera America's camera equipment.

*Press lights at Highmont Dr / Gage Dr. were placed on ground for safety reasons. The camera was angled down so that the camera light would not illuminate the officers. (Light was illuminating officers' position to the crowd and obstructing the officers' view of where the assault was coming from. Officers were taking an assault of bricks, bottles, and gunfire was heard in the area. Request was made earlier verbally to press to extinguish light.)*

151.    As noted above, the true facts are that the camera had no light on it, and the camera was therefore pointed down to the ground not "for safety reasons," but to prevent the camera from recording the activities of the police.

152.    Equally false is the claim that while the officers were dismantling the news crew's equipment "[o]fficers were taking an assault of bricks [and] bottles."

153.    As shown on both the video recorded by Winslade's camera and the KSDK video which was recorded from across the intersection, no one was throwing bricks, bottles or anything else at the officers while they pointed Winslade's camera at the ground.

154.    Also false is the claim that "[r]equest was made earlier verbally to press to extinguish light."

155.    Winslade's video camera recorded both video and audio and at no time did any one ask, demand or otherwise request that Quraishi, Cichowski and Winslade turn off their television lights.

156.    The Synopsis goes on to state:

*Al Jazeera calls Command for help. BearCat responds to Highmont / S. Dellwood to secure Al Jazeera crew. (2 males and 1 female). Crew secured and SCC Regional SWAT Element provides security while they load their vehicle. (All Al Jazeera staff gave hugs to county SCC Regional SWAT officers).*

157.    This description of events is both false and misleading.

158.    It is misleading because at no time did the SWAT officers inform Quraishi, Cichowski and Winslade that they were the ones who tear gassed them.

159.    More importantly, the true facts are that far from hugging the SWAT Team officers for rescuing them, Winslade's video records Cichowski—who was still coughing and

retching from being gassed—repeatedly cursing at the officers as they demanded that she hurry up and pack up and leave the area.

160. Finally, the Synopsis states that "[w]hile crew was loading vehicle, approximately 30 demonstrators began encroaching on the Element."

161. The true facts are that no one "encroached on the Element" while Quraishi, Cichowski and Winslade were loading their equipment into their van, and the news crew was never in any danger from anyone other than the police.

**Still More False Police Reports from SWAT Team Members**

162. In addition to the SWAT Team's reports, individual members of the SWAT Team submitted their own reports, which were similarly false and misleading.

163. For example, St. Peters Police Officer Phil Holmes submitted a "Supplemental Narrative Report," which was approved by St. Charles County Sheriff's Department Det. Tim McMann, the SWAT Team's Assistant Team Commander, in which Officer Holmes stated:

> *There was a spotlight near the intersection of Highmont Drive at Gage Drive. The spotlight was preventing me and the other officers from being able to see down Highmont Drive. The other officers repeated yelled to turn the spotlight off, but the light remained on.*

164. As noted above, Winslade's video camera recorded both video and audio and at no time did any officer ask, demand or otherwise request that Quraishi, Cichowski and Winslade turn off their television lights.

165. Deputy Anderson also submitted a "Supplemental Narrative Report," which was approved by Sgt. Ochs.

166. In his police report, Deputy Anderson stated:

- 37 -

*[T]here was a bright light that was being shined in our direction on Highmont Drive. This was an ·extremely bright light and was making it difficult to see the exact subjects throwing the objects. Subjects began throwing rocks again from the area of the light on Highmont Drive in our direction. I observed a glass bottle break in front of my feet. Concerned about the safety of other officers and myself, I then deployed a CS round towards Highmont Drive, making sure I didn't deploy the round past the light. The round landed in front of the light not striking any person(s). The round was deployed in the area where the rock and glass bottles came from.*

167.     Deputy Anderson's description of these events is false.

168.     The true facts are that no one was throwing any objects at the officers from the direction of the Al Jazeera America's news crew's lights.

169.     As such, Deputy Anderson's description of the events is a pretense for the fact he unjustifiably fired the CS round directly at Quraishi, Cichowski and Winslade.

### The County Continues to Hide the Truth

170.     After Quraishi, Cichowski and Winslade retained counsel to investigate the assault on them by police, on December 29, 2014, their counsel, Bernard Rhodes, submitted a Missouri Sunshine Law request to the St. Charles County Sheriff.

171.     The request sought, among other things, all police reports of the SWAT Team's activities on August 13, 2014, all video recordings of the SWAT Team's activities that day, the statement issued by the Sheriff's Department, and all training materials used to train the SWAT Team members on how to handle civil disturbances.

172.     The Missouri Sunshine Law obligates public governmental bodies to respond to Sunshine Law requests within three business days.

173.    In the County's initial response, which was sent by St. Charles County Associate County Counselor Holly Ragan, the County falsely claimed the Sheriff's Department did not issue a statement relating to the SWAT Team's actions on August 13, 2014.

174.    Specifically, in response to the request for a copy of the statement the Sheriff's Department released regarding the SWAT Team's activities on August 13, 2014, Ragan made the statement: "The St. Charles County Sheriff Department did not issue a statement on any date related to the SWAT Team's activities on August 13, 2014."

175.    Only after Rhodes provided Ragan with copies of numerous media reports quoting the Sheriff Department's statement did she acknowledge the fact the Department had issued a statement, and belatedly provided a copy of the statement.

176.    In her initial response to the Sunshine Law request, Ragan also objected to providing any police reports.

177.    Again, only after Rhodes wrote the Missouri Attorney General's Office and complained about the County's position did Ragan relent and provide any police reports.

178.    Even then, however, Ragan redacted the names of all of the members of the SWAT Team, claiming that disclosure of the officers' names would "pose a clear and present danger to the safety of" the officers.

179.    This is the same reason the Ferguson Police Chief repeatedly used for refusing to release the name of the police officer who shot and killed Michael Brown.

180.    The redacted police reports and other documents consisted of a total of 100 pages, for which the County charged Rhodes $1,356.73 in "research costs."

**The Medic's Videos Mysteriously Appear—But Are Incomplete**

181.    At the time Ragan provided the redacted police reports, she stated the County had no records responsive to the request for video recordings of the SWAT Team's activities on August 13, 2014.

182.    A month later, however, on February 6, 2015, Ragan wrote Rhodes and disclosed that there were GoPro video recordings of the SWAT Team's activities, despite her earlier claim to the contrary.

183.    Nearly a month after that, Ragan forwarded the video recordings, but only after Rhodes was required to pay another $500 to the County for the videos, which were produced on two $10.00 flash drives.

184.    The GoPro HERO3+ Black Edition video camera which SWAT Team medic Jones used to "get good footage" of the SWAT Team's activities on August 13, 2014, automatically names the video files with consecutive numbers, and applies a time-stamp to the video file.

185.    The GoPro video files produced by St. Charles County run consecutively, from file "091," which is time-stamped "8/13/2014 5:46 PM," through file "102," which is time-stamped "8/13/2014 8:54 PM."

186.    The next three GoPro video files produced by St. Charles County are files "103," "104" and "105."

187.    However, all three files (*i.e.*, 103-105) have the identical time stamp of "8/13/2014 9:35 PM."

188.    Because it is not possible for the three different video files to be recorded by the GoPro camera at the exact same time, the time stamp on these video files appear to have been tampered with.

189.    Moreover, the next video file produced by St. Charles County is file "108," which is time-stamped "8/13/2014 10:05 PM."

190.    The County has neither produced file numbers 106 or 107, nor provided any explanation for its failure to produce those files, despite a specific request to do so.

191.    Accordingly, either the County has wrongfully withheld these videos, or they have been intentionally destroyed.

192.    Based on the chronology of events, the missing video files would have included the time the officers were dismantling Quraishi, Cichowski and Winslade's equipment, ordering the three journalists into the SWAT Team's armored vehicle, and ordering them to leave.

**The County Admits the SWAT Team Had No Civil Disturbance Training**

193.    Among the Sunshine Law requests Rhodes made to the St. Charles County Sheriff was a specific request for: "All training materials used to provide training to the SWAT Team members who were called out [on August 13, 2014] relating to civil disturbances."

194.    In her January 2, 2015 response, Ragan asked for clarification, writing: "Are you requesting all training materials that were used to provide training for any SWAT Team member called out on August 13, 2014 for a civil disturbance, or is your request limited to training materials related to civil disturbances?"

195.    On January 6, 2015, Rhodes responded by stating: "My request is only for training materials related to civil disturbances."

196.    On January 9, 2015, Ragan responded, writing:

*Attached are the training materials related to civil disturbances. Portions of these records are closed pursuant to Section 600.100.3 and are therefore redacted. I have attached a printout of the slides from the accompanying Powerpoint presentation. That presentation includes several short videos, so it is too large to transmit in electronic form. Please let me know if you would like the Powerpoint presentation transmitted to you in a different format. For your information, these materials were created after August 13, 2014, but there are no earlier records that respond to your request.*

197.    Based on Ragan's unconditional statement that the only materials responsive to the request "were created after August 13, 2014" and that "there are no earlier records that respond to your request," St. Charles County has admitted it had no "training materials related to civil disturbances" prior to August 13, 2014.

198.    Moreover, even the "new" training materials the County produced confirm that the SWAT Team has never received training on First Amendment protection of journalists.

### The County Relents and Provides Unredacted Records

199.    As to the Sunshine Law request for police reports, on March 17, 2015—two and a half months after the initial Sunshine Law Request was made—the County finally relented and provided unredacted copies of the police reports, revealing for the first time the names of some of the officers involved in the assault on Quraishi, Cichowski and Winslade.

200.    Even then, however, the reports failed to identify the unknown police shooters who shot at Quraishi, Cichowski and Winslade.

### Quraishi Continued To Suffer Complications From Being Gassed

201.    Meanwhile, Quraishi continued to suffer complications from being gassed by Deputy Anderson.

202.    Among other things, Quraishi experienced otherwise unexplained cardiac arrhythmia, and has incurred significant medical expenses in this regard.

203.    Quraishi's symptoms are consistent with published medical reports, which document that persons who are directly exposed to CS gas frequently report symptoms at 8-10 months following exposure.

## Jurisdiction and Venue

204.    Because Quraishi, Cichowski and Winslade bring claims under 42 U.S.C. § 1983 for violation of their civil rights, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1343(a).

205.    This Court has supplemental jurisdiction over Quraishi, Cichowski and Winslade's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to their civil rights claims that they form part of the same case or controversy under Article III of the United States Constitution.

206.    Additionally, this Court has subject matter jurisdiction over Quraishi, Cichowski and Winslade's state law claims pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds the jurisdictional amount.

207.    This Court has personal jurisdiction over each of the Defendants because each of the individual Defendants are Missouri citizens and Defendant St. Charles County, Missouri is a county of the State of Missouri.

208.    Defendant St. Charles County, Missouri purchased liability insurance for tort claims occurring during the policy period May 1, 2014 to May 1, 2015 and, has accordingly,

waived sovereign immunity as to any such claim up to the maximum amount of such insurance, *i.e.*, $7 million.

209.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because all Defendants are residents of this District, and because the events giving rise to Quraishi, Cichowski and Winslade's claims occurred in this District.

210.    Venue is proper in the Eastern Division of this District pursuant to Local Rule 3-207(B)(2) because all Defendants are residents of the Eastern Division, and because the events giving rise to Quraishi, Cichowski and Winslade's claims for relief arose in the Eastern Division.

### Count I – Violation of First Amendment
### (Deputy Michael Anderson, in his individual capacity)

211.    Quraishi, Cichowski and Winslade reallege and incorporate by reference the allegations in Paragraphs 1-210.

212.    The First Amendment to the United States Constitution guarantees that "Congress shall make no law … abridging the freedom of speech, or of the press."

213.    The Fourteenth Amendment to the United States Constitution extends the protection of the First Amendment to actions taken by local governments and by local government officials.

214.    Prior to August 13, 2014, it was clearly established that the First Amendment guaranteed the press the right to gather information about matters of legitimate public concern.

215.    The killing of an unarmed black man in Ferguson, Missouri by a white Ferguson, Missouri police officer—whose identity was being withheld by authorities—and the resulting public outcry and protests over the killing was a matter of legitimate public concern in and around Ferguson, Missouri on August 13, 2014.

216.     Prior to August 13, 2014, it was also clearly established that the First Amendment guaranteed to every person the right to videotape police in a public place carrying out their duties.

217.     On August 13, 2014, when Deputy Anderson tear gassed Quraishi, Cichowski and Winslade, the three journalists were located in a public place, *i.e.*, the street and sidewalk in front of 1358 Highmont Drive, Ferguson, Missouri.

218.     Prior to August 13, 2014, it was also clearly established that the First Amendment prohibited government officials, including the police, from suppressing information that is critical of government action or inaction.

219.     On August 13, 2014, when Deputy Anderson tear gassed Quraishi, Cichowski and Winslade, he did not have an objectively reasonable belief that Quraishi, Cichowski or Winslade were engaged in, or about to engage in, any illegal activity.

220.     Nor did Deputy Anderson have an objectively reasonable belief that anyone in or around the area where Quraishi, Cichowski or Winslade were standing was engaged in, or about to engage in, any illegal activity.

221.     On August 13, 2014, when Deputy Anderson tear gassed Quraishi, Cichowski and Winslade, he did not have an objectively reasonable belief that Quraishi, Cichowski or Winslade were obstructing, or about to obstruct, law enforcement officers in the legitimate performance of their duties.

222.     Nor did Deputy Anderson have an objectively reasonable belief that anyone in or around the area where Quraishi, Cichowski or Winslade were standing was obstructing, or about to obstruct, law enforcement officers in the legitimate performance of their duties.

223.    On August 13, 2014, when Deputy Anderson tear gassed Quraishi, Cichowski and Winslade, he—and other members of the St. Charles County Regional SWAT Team—knew that Quraishi, Cichowski and Winslade were journalists engaged in gathering and reporting information on a matter of legitimate public concern.

224.    In fact, the SWAT Team's own reports—while falsely claiming that objects were being thrown from the area where Quraishi, Cichowski or Winslade were standing— acknowledge in three separate places that the SWAT Team knew that journalists were present in the area.

225.    Specifically, in the SWAT Team's official Offense / Incident Report the SWAT Team states: "Subjects throwing objects at officers from behind a house and **behind a news crew**. CS deployed to both areas." (Emphasis added).

226.    Similarly, in the SWAT Team's Synopsis of Events, the SWAT Team states that at "2130 [*i.e.*, 9:30 p.m.] the Line [of officers] starts taking assault from subjects behind houses and **behind media**." (Emphasis added).

227.    Finally, the SWAT Team's Synopsis of Events also states: "Light was illuminating officers' position to the crowd and obstructing the officers' view of where the assault was coming from. Officers were taking an assault of bricks, bottles, and gunfire was heard in the area. **Request was made earlier verbally to press to extinguish light**." (Emphasis added).

228.    On August 13, 2014, when Deputy Anderson tear gassed Quraishi, Cichowski and Winslade, he did so for the purpose of abridging Quraishi, Cichowski and Winslade's First Amendment rights by restricting their ability to gather information about a matter of legitimate public concern.

229.    On August 13, 2014, when Deputy Anderson tear gassed Quraishi, Cichowski and Winslade, he did so for the purpose of abridging Quraishi, Cichowski and Winslade's First Amendment rights by prohibiting them from videotaping the activities of the St. Charles County Regional SWAT Team.

230.    On August 13, 2014, when Deputy Anderson tear gassed Quraishi, Cichowski and Winslade, he did so for the purpose of abridging Quraishi, Cichowski and Winslade's First Amendment rights by suppressing information that was likely to be critical of the activities of the St. Charles County Regional SWAT Team.

231.    On August 13, 2014, when Deputy Anderson tear gassed Quraishi, Cichowski and Winslade, he did so willfully, knowingly and intentionally.

232.    As a direct and proximate result of Deputy Anderson tear gassing of Quraishi, Cichowski and Winslade, they suffered physical and emotional injuries.

WHEREFORE, Plaintiffs Ash-har Quraishi, Marla Cichowski and Sam Winslade request that they be awarded actual and punitive damages, together with their attorney's fees pursuant to 42 U.S.C. § 1988(b), the costs of this action, and such other and further relief as this Court deems just, against Defendant Deputy Michael Anderson, in his individual capacity.

### Count II – Violation of First Amendment
### (St. Charles County)

233.    Quraishi, Cichowski and Winslade reallege and incorporate by reference the allegations in Paragraphs 1-232.

234.    Prior to August 13, 2014, St. Charles County knew that the St. Charles County Regional SWAT Team could be called out to respond to civil disturbances.

235.    In fact, the "St. Charles County Regional SWAT Team Agreement"—which was executed by St. Charles County and each participating municipality prior to the Michael Brown

shooting—expressly provides that "[t]he SWAT Team will respond to high risk law enforcement situations requiring extraordinary control and/or coordinated action by trained, specialized law enforcement personnel, including without limitation situations involving … civil disturbances."

236.    The St. Charles County Regional SWAT Team Agreement further provides that "the SWAT Team is dedicated to serving and protecting citizens within the entire County, and is empowered to do so only pursuant to the authority of the County Sheriff."

237.    The St. Charles County Regional SWAT Team Agreement further provides that "[t]he SWAT Team shall be under the supervision and control of the Sheriff's Department, Bureau of Special Enforcement."

238.    From 2004 through December 31, 2014, the head of the St. Charles County Sheriff's Department's Bureau of Special Enforcement was Capt. David Todd.

239.    The St. Charles County Regional SWAT Team Agreement further provides that "[p]articipating police departments agree to have their personnel participate in two (2) eight (8) hour training days per month to include without limitation firearms and tactics."

240.    The St. Charles County Regional SWAT Team Agreement further provides that "[a]ll team members will participate in one (1) continuous five (5) day, 40-hour training course in the fall of each year to maintain team proficiency."

241.    The St. Charles County Regional SWAT Team Agreement further provides that "[p]ersonnel who do not make training or do not successfully complete training are subject to dismissal from that SWAT Team, whether that missing training is related to firearms, tactical, physical or legal training."

242.    Prior to August 13, 2014, it was well-recognized by law enforcement agencies throughout the United States that training and guidelines on responding to civil disturbances were appropriate and necessary.

243.    In fact, when the St. Charles County Regional SWAT Team finally began civil disturbance training sometime after August 13, 2014, the SWAT Team used training materials that had been in existence for years prior to that time, including:

a.      U.S. Army Field Manual FM3-19-15, titled "*Civil Disturbance Operations*," which was approved for public release in April 2005;

b.      "*P.O.S.T. Guidelines for Crowd Control*," which was published by the California Commission on Peace Officer Standards and Training in March 2012;

c.      Los Angeles County Sheriff Department EOP 4.4, "Mobile Field Force," published in 2006.

244.    Additionally, prior to August 13, 2014, it was well-recognized by law enforcement agencies throughout the United States that civil disturbance training should include specific training on the First Amendment.

245.    In fact, the Forward of the California POST Guidelines, which were published in March 2012, states that "[t]hese guidelines provide … a resource for law enforcement leaders to provide foundational guidance for the facilitation of First Amendment rights while allowing discretion and flexibility in the development of individual agency policies."

246.    Moreover, the Introduction to the California POST Guidelines begins by explicating quoting the First Amendment:

In the United States all people have the right of free speech and assembly guaranteed by the First Amendment of the Constitution. The First Amendment

states "**Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances**." (Emphasis in original).

247.    Additionally, prior to August 13, 2014, it was well-recognized by law enforcement agencies throughout the United States that civil disturbance training should include specific training on the rights of journalists to gather information about civil disturbances, and to be able to report that information.

248.    For example, in March 2012, the retired Undersheriff of the Los Angeles County Sheriff's Department published an article in *Police Chief*, the official publication of the International Association of Chiefs of Police, titled "Civil Disturbance Readiness: How Ready is Your Agency?," in which he specifically addressed the need for training relating to the treatment of journalists covering civil disturbances.

249.    Among other things, he wrote: "Since media omnipresence is a given, the smart incident and field force commanders will engage the media and the viewing public with images of officers acting professionally and effectively in controlling the rioters. Instead of trying to keep the media away from their operations, the smart field commanders will think like the military and actually embed media in their operations. This not only provides doubters with transparency, but it reassures the viewing public that law enforcement is extremely competent."

250.    Additionally, Mickey Osterreicher, the General Counsel of the National Press Photographers Association—a non-profit organization whose members are approximately 7,000 television and still photographers—has personally presented workshops and provided model

guidelines regarding the right to photograph and record in public to the Legal Officers Section of the International Association of Chiefs of Police, the National Sheriffs Association, the New York State Sheriffs Association, the Georgia Chiefs of Police, as well as numerous individual law enforcement agencies.

251.    Despite the obligations imposed on them by the St. Charles County Regional SWAT Team Agreement to train SWAT Team members—and the widespread availability and use of civil disturbance training materials—prior to August 13, 2014, the St. Charles County Sheriff, together with the head of the Department's Bureau of Special Enforcement, Capt. David Todd, failed to provide SWAT Team members with any training relating to civil disturbances.

252.    Such a failure to train reflects a deliberate indifference to the rights of persons who may either participate in civil disturbances or to the rights of journalists who may be attempting to legitimately report on such civil disturbances.

253.    The failure of the St. Charles County Sheriff's Department to train the members of the St. Charles County Regional SWAT Team on responding to civil disturbances proximately led to the violations of Quraishi, Cichowski and Winslade's First Amendment rights, as alleged in Count I, above.

254.    Moreover, the failure to train SWAT Team members resulted in a custom and practice or usage within the St. Charles County Sheriff's Department in general, and the St. Charles County Regional SWAT Team in particular, of violating the First Amendment rights of citizens whenever the officer believed the citizen was challenging the authority of the officer.

255.    For example, earlier in the day on August 13, 2014, members of the St. Charles County Regional SWAT Team forcibly dispersed citizen protestors who had committed no crime

and who posed no reasonably objective risk of breach of peace, solely because the citizen protestors refused the SWAT Team's order to disperse.

256.     Similarly, after the SWAT Team arrested a black woman who yelled out for her son to call the national television network CNN, a SWAT Team member told her: "You should have been more conscious about that before you ran your mouth."

257.     And when SWAT Team members observed St. Louis City Alderman Antonio French—who was sitting in his car breaking no law and posing no reasonably objective safety risk, but instead "remained inside holding up his cell phone in an obvious attempt to video tape the police response"— he was arrested on trumped-up criminal charges.

258.     This custom and practice or usage proximately led to the violations of Quraishi, Cichowski and Winslade's First Amendment rights, as alleged in Count I, above.

WHEREFORE, Plaintiffs Ash-har Quraishi, Marla Cichowski and Sam Winslade request that they be awarded actual damages, together with their attorney's fees pursuant to 42 U.S.C. § 1988(b), the costs of this action, and such other and further relief as this Court deems just, against Defendant St. Charles County, Missouri.

### Count III – Violation of Fourteenth Amendment
### (Deputy Michael Anderson, in his individual capacity)

259.     Quraishi, Cichowski and Winslade reallege and incorporate by reference the allegations in Paragraphs 1-258.

260.     The Fourteenth Amendment to the United States Constitution guarantees that "No state shall … deprive any person of life, liberty, or property without due process of law."

261.     The Fourteenth Amendment due process guarantee applies not only to states themselves, but to local governments and local government officials as well.

262.    The actions of Deputy Michael Anderson on August 13, 2014 in gassing Quraishi, Cichowski and Winslade when he did not have a reasonably objective belief that:

    a.    Quraishi, Cichowski or Winslade were engaged in, or about to engage in, any illegal activity;

    b.    anyone in or around the area where Quraishi, Cichowski or Winslade were standing was engaged in, or about to engage in, any illegal activity;

    c.    Quraishi, Cichowski or Winslade were obstructing, or about to obstruct, law enforcement officers in the legitimate performance of their duties; or

    d.    anyone in or around the area where Quraishi, Cichowski or Winslade were standing was obstructing, or about to obstruct, law enforcement officers in the legitimate performance of their duties,

violated Quraishi, Cichowski and Winslade's Fourteenth Amendment right to due process.

263.    The actions of Deputy Michael Anderson on August 13, 2014 in gassing Quraishi, Cichowski and Winslade were egregious, offensive to human dignity, and shock the conscience.

264.    On August 13, 2014, when Deputy Anderson tear gassed Quraishi, Cichowski and Winslade, he did so willfully, knowingly and intentionally.

265.    As a direct and proximate result of Deputy Anderson tear gassing of Quraishi, Cichowski and Winslade, they suffered physical and emotional injuries.

WHEREFORE, Plaintiffs Ash-har Quraishi, Marla Cichowski and Sam Winslade request that they be awarded actual and punitive damages, together with their attorney's fees pursuant to 42 U.S.C. § 1988(b), the costs of this action, and such other and further relief as this Court deems just, against Defendant Deputy Michael Anderson, in his individual capacity.

**Count IV – Violation of Fourteenth Amendment**
**(St. Charles County)**

266.     Quraishi, Cichowski and Winslade reallege and incorporate by reference the allegations in Paragraphs 1-265.

267.     Prior to August 13, 2014, the St. Charles County Sheriff's Department (a) knew that the St. Charles County Regional SWAT Team could be called out to respond to civil disturbances, and (b) undertook to provide members of the St. Charles County Regional SWAT Team training.

268.     Despite this knowledge and this express undertaking, prior to August 13, 2014, the St. Charles County Sheriff's Department failed to provide members of the St. Charles County Regional SWAT Team training on responding to civil disturbances.

269.     Such a failure to train reflects a deliberate indifference to the rights of persons who may either participate in civil disturbances or to the rights of journalists who may be attempting to legitimately report on such civil disturbances.

270.     The failure of the St. Charles County Sheriff's Department to train the members of the St. Charles County Regional SWAT Team on responding to civil disturbances proximately led to the violations of Quraishi, Cichowski and Winslade's Fourteenth Amendment rights, as alleged in Count III, above.

271.     Moreover, the failure to train SWAT Team members resulted in a custom and practice or usage within the St. Charles County Sheriff's Department in general, and the St. Charles County Regional SWAT Team in particular, of violating the due process rights of citizens whenever the officer believed the citizen was challenging the authority of the officer.

272.     For example, earlier in the day on August 13, 2014, members of the St. Charles County Regional SWAT Team forcibly dispersed citizen protestors who had committed no crime

and who posed no reasonably objective risk of breach of peace, solely because the citizen protestors refused the SWAT Team's order to disperse.

273.     Similarly, after the SWAT Team arrested a black woman who yelled out for her son to call the national television network CNN, a SWAT Team member told her: "You should have been more conscious about that before you ran your mouth."

274.     And when SWAT Team members observed St. Louis City Alderman Antonio French—who was sitting in his car breaking no law and posing no reasonably objective safety risk, but instead "remained inside holding up his cell phone in an obvious attempt to video tape the police response"— he was arrested on trumped-up criminal charges.

275.     This custom and practice or usage proximately led to the violations of Quraishi, Cichowski and Winslade's Fourteenth Amendment rights, as alleged in Count III, above.

WHEREFORE, Plaintiffs Ash-har Quraishi, Marla Cichowski and Sam Winslade request that they be awarded actual damages, together with their attorney's fees pursuant to 42 U.S.C. § 1988(b), the costs of this action, and such other and further relief as this Court deems just, against Defendant St. Charles County, Missouri.

## Count V – Violation of Fourth Amendment
### (Deputy Michael Anderson, in his individual capacity)

276.     Quraishi, Cichowski and Winslade reallege and incorporate by reference the allegations in Paragraphs 1-275.

277.     The Fourth Amendment to the United States Constitution guarantees that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

278.    The Fourteenth Amendment to the United States Constitution extends the protection of the Fourth Amendment to actions taken by local governments and by local government officials.

279.    "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, ''by means of physical force or show of authority,'' terminates or restrains his freedom of movement 'through means intentionally applied.'" *Brendlin v. California*, 551 U.S. 249, 254 (2007).

280.    When Deputy Anderson fired a 40 mm CS round from his grenade launcher directly at Quraishi, Cichowski and Winslade he intended to terminate or restrain their freedom to remain in their location and continue their newsgathering and reporting.

281.    In fact, Quraishi, Cichowski and Winslade immediately fled the area and abandoned their newsgathering and reporting.

282.    As such, Quraishi, Cichowski and Winslade were seized as that term is used in the Fourteenth Amendment.

283.    The actions of Deputy Michael Anderson on August 13, 2014 in gassing Quraishi, Cichowski and Winslade when he did not have a reasonably objective belief that:

a.    Quraishi, Cichowski or Winslade were engaged in, or about to engage in, any illegal activity;

b.    anyone in or around the area where Quraishi, Cichowski or Winslade were standing was engaged in, or about to engage in, any illegal activity;

c.    Quraishi, Cichowski or Winslade were obstructing, or about to obstruct, law enforcement officers in the legitimate performance of their duties; or

d.      anyone in or around the area where Quraishi, Cichowski or Winslade were standing was obstructing, or about to obstruct, law enforcement officers in the legitimate performance of their duties,

violated Quraishi, Cichowski and Winslade's Fourth Amendment right to be protected from unreasonable seizures.

284.    On August 13, 2014, when Deputy Anderson tear gassed Quraishi, Cichowski and Winslade, he did so without an objectively reasonable belief that probable cause existed to seize the three journalists.

285.    On August 13, 2014, when Deputy Anderson tear gassed Quraishi, Cichowski and Winslade, he did so willfully, knowingly and intentionally.

286.    As a direct and proximate result of Deputy Anderson tear gassing of Quraishi, Cichowski and Winslade, they suffered physical and emotional injuries.

WHEREFORE, Plaintiffs Ash-har Quraishi, Marla Cichowski and Sam Winslade request that they be awarded actual and punitive damages, together with their attorney's fees pursuant to 42 U.S.C. § 1988(b), the costs of this action, and such other and further relief as this Court deems just, against Defendant Deputy Michael Anderson, in his individual capacity.

### Count VI – Violation of Fourth Amendment
### (St. Charles County)

287.    Quraishi, Cichowski and Winslade reallege and incorporate by reference the allegations in Paragraphs 1-286.

288.    Prior to August 13, 2014, the St. Charles County Sheriff's Department (a) knew that the St. Charles County Regional SWAT Team could be called out to respond to civil disturbances, and (b) undertook to provide members of the St. Charles County Regional SWAT Team training.

289.    Despite this knowledge and this express undertaking, prior to August 13, 2014, the St. Charles County Sheriff's Department failed to provide members of the St. Charles County Regional SWAT Team training on responding to civil disturbances.

290.    Such a failure to train reflects a deliberate indifference to the rights of persons who may either participate in civil disturbances or to the rights of journalists who may be attempting to legitimately report on such civil disturbances.

291.    The failure of the St. Charles County Sheriff's Department to train the members of the St. Charles County Regional SWAT Team on responding to civil disturbances proximately led to the violations of Quraishi, Cichowski and Winslade's Fourth Amendment rights, as alleged in Count III, above.

292.    Moreover, the failure to train SWAT Team members resulted in a custom and practice or usage within the St. Charles County Sheriff's Department in general, and the St. Charles County Regional SWAT Team in particular, of violating the Fourth Amendment rights of citizens whenever the officer believed the citizen was challenging the authority of the officer.

293.    For example, earlier in the day on August 13, 2014, members of the St. Charles County Regional SWAT Team forcibly dispersed citizen protestors—through use of tear gas canisters, tear gas cartridges, pepper balls, and smoke grenades—who had committed no crime and who posed no reasonably objective risk of breach of peace, solely because the citizen protestors refused the SWAT Team's order to disperse.

294.    Similarly, the SWAT Team arrested a black woman who had committed no crime, simply because she had not moved fast enough.

295.    And when SWAT Team members observed St. Louis City Alderman Antonio French—who was sitting in his car breaking no law and posing no reasonably objective safety

risk, but instead "remained inside holding up his cell phone in an obvious attempt to video tape the police response"— he was arrested on trumped-up criminal charges.

296.    This custom and practice or usage proximately led to the violations of Quraishi, Cichowski and Winslade's Fourth Amendment rights, as alleged in Count V, above.

297.    Additionally, this custom and practice or usage proximately led to the seizure of Quraishi, Cichowski and Winslade when they were forced at gunpoint into the SWAT Team's armored vehicle against their will.

WHEREFORE, Plaintiffs Ash-har Quraishi, Marla Cichowski and Sam Winslade request that they be awarded actual damages, together with their attorney's fees pursuant to 42 U.S.C. § 1988(b), the costs of this action, and such other and further relief as this Court deems just, against Defendant St. Charles County, Missouri.

## Count VII – Battery (formerly Count X)
### (Deputy Michael Anderson, in his individual capacity)

298.    Quraishi, Cichowski and Winslade reallege and incorporate by reference the allegations in Paragraphs 1-297.

299.    The actions of Deputy Michael Anderson on August 13, 2014 in gassing Quraishi, Cichowski and Winslade when he did not have a reasonably objective belief that:

a.    Quraishi, Cichowski or Winslade were engaged in, or about to engage in, any illegal activity;

b.    anyone in or around the area where Quraishi, Cichowski or Winslade were standing was engaged in, or about to engage in, any illegal activity;

c.    Quraishi, Cichowski or Winslade were obstructing, or about to obstruct, law enforcement officers in the legitimate performance of their duties; or

      d.     anyone in or around the area where Quraishi, Cichowski or Winslade were standing was obstructing, or about to obstruct, law enforcement officers in the legitimate performance of their duties,

caused Quraishi, Cichowski and Winslade to suffer physical and emotional injuries.

      300.    On August 13, 2014, when Deputy Anderson tear gassed Quraishi, Cichowski and Winslade, he did so willfully, knowingly and intentionally.

      WHEREFORE, Plaintiffs Ash-har Quraishi, Marla Cichowski and Sam Winslade request that they be awarded actual and punitive damages, together with the costs of this action, and such other and further relief as this Court deems just, against Defendant Deputy Michael Anderson, in his individual capacity.

### Jury Demand

      Plaintiffs Ash-har Quraishi, Marla Cichowski and Sam Winslade demand a trial by jury on all issues triable to a jury.

                   Respectfully submitted,

                   LATHROP & GAGE, LLP

               By: */s/Bernard J. Rhodes*
                     Bernard J. Rhodes    (EDMO #550712)
                     2345 Grand Blvd., Ste. 2400
                     Kansas City, MO  64108
                     (816) 292-2000 – Telephone
                     (816) 292-2001 – Facsimile
                     brhodes@lathropgage.com

                     ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I certify that a copy of the above was filed on December 18, 2017, using the Court's CM/ECF system, which will generate notice to the following counsel of record:

      Holly E. Ragan
      Beverly E. Temple
      Rory P. O'Sullivan
      Office of the St. Charles County Counselor
      100 N. 3rd St., Ste. 216
      St. Charles, MO  63301
      hragan@sccmo.org
      btemple@sccmo.org
      rosullivan@sccmo.org

                           */s/Bernard J. Rhodes*
                           An Attorney for Plaintiffs