UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ASH-HAR QURAISHI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:16-CV-1320 NAB |
| | ) | |
| ST. CHARLES COUNTY, MISSOURI, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

Plaintiffs, who are journalists, filed this action against Defendants alleging violations of their constitutional rights during Plaintiffs' news coverage of protests in Ferguson, Missouri on August 13, 2014 following the shooting death of teenager Michael Brown by a Ferguson police officer.  This matter is before the Court on Defendants' Motion for Summary Judgment and Supplemental Motion for Summary Judgment.  [Docs. 53, 76.]

### Procedural Background

Plaintiffs Ash-har Quraishi, Marla Cichowski, and Sam Winslade filed this action against St. Charles County, Missouri; Deputy Michael Anderson of the St. Charles County Police Department, and two unidentified John Doe Defendants.  The Court granted Plaintiffs' request to dismiss the John Doe defendants on July 27, 2017.  [Docs. 51, 52.]  Plaintiffs filed a First Amended Complaint on December 18, 2017 and that complaint is the subject of this memorandum and order.  [Doc. 64.]  Defendants' Motion for Summary Judgment and Supplemental Motion for Summary Judgment are now fully briefed.

In the First Amended Complaint, Plaintiffs present seven claims.  Counts I and II allege that Deputy Michael Anderson and St. Charles County violated their First Amendment rights to

gather information about matters of legitimate public concern as members of the press.  Counts III and IV allege, alternatively, that Deputy Anderson and St. Charles County violated their Fourteenth Amendment rights to due process.  Counts V and VI allege that Deputy Anderson and St. Charles County unlawfully seized and detained Plaintiffs in violation of the Fourth Amendment.  Finally, Count VII alleges that Deputy Anderson committed battery against Plaintiffs.  All of the claims against Deputy Anderson are filed against him in his personal or individual capacity.

## Standard of Review

A party may move for summary judgment, identifying each claim or defense on which summary judgment is sought.  Fed. R. Civ. P. 56(a).  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civil P. 56(a).  "A dispute about a material fact is 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Herring v. Can. Life Assur. Co.*, 207 F.3d 1026, 1028 (8th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A party resisting summary judgment has the burden to designate the specific facts that create a triable controversy.  *See Crossley v. Georgia-Pacific Corp.*, 355 F.3d 1112, 1113 (8th Cir. 2004).  Self-serving, conclusory statements without support are not sufficient to defeat summary judgment.  *Armour and Co., Inc. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993).

## Discussion

### A.    Admissible Evidence in Summary Judgment Briefing

The Court will first address the parties' dispute regarding some of the evidence presented to support and oppose Defendants' summary judgment motions.  "A district court enjoys wide

discretion in ruling on the admissibility of proffered evidence." *U.S. Salt, Inc. v. Broken Arrow, Inc.*, 563 F.33d 687, 689-90 (8th Cir. 2009). The two primary issues that require the Court's attention are Plaintiffs' counsel's declarations and Defendants' affidavits on summary judgment that contradict responses to a Missouri Sunshine law request.

Rule 56(c) states

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purpose of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited to do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support that fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A declaration that does not satisfy these requirements can be disregarded. *See Jain v. CVS Pharmacy, Inc.*, 779 F.3d 753, 758 (8th Cir. 2015). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P 56(c)(2). Local Rule 4.01(e) provides as follows:

> A memorandum in support of a motion for summary judgment shall have attached a statement of uncontroverted material facts, set forth in a separately numbered paragraph for each fact, indicating whether each fact is established by the record, and, if so, the appropriate citations. Every memorandum in opposition shall include a statement of material facts as to which the party contends a genuine issue exists. Those matters in dispute shall be set forth with specific references to portions of the record, where available, upon which the opposing party relies. The opposing party

also shall note for all disputed facts the paragraph number from movant's listing of facts.  All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party.

## B.      Mr. Rhodes' Declarations

Plaintiffs' counsel Bernard Rhodes submitted two declarations in opposition to Defendants' Motion for Summary Judgment.  He also attached several exhibits to these declarations.  The first declaration includes Exhibits A through Y.  Exhibits A-D consist of correspondence from Mr. Rhodes to St. Charles County's custodian of records and Defendants' legal counsel Holly E. Ragan.  Exhibits E-M to Mr. Rhodes' first declaration are the Defendant's Initial Disclosures pursuant to Rule 26(a) and the documents or media produced with the initial disclosures.  Exhibits N-O are correspondence between Mr. Rhodes and Ms. Ragan regarding a revised request for evidence under Missouri's Sunshine Law.  Exhibit P is an e-mail from St. Charles County's Public Affairs Coordinator to another County employee regarding St. Charles County's Swat Team activity in Ferguson, Missouri on August 13, 2014.  Exhibits R-V are discovery requests and responses between the parties.  Exhibits W, X, and Y are audio and video files that were produced by the Defendants during discovery.  The second declaration contains two Exhibits.  Exhibit Z is a news article from the internet produced by Defendants and Exhibit AA is another video produced by Defendants during discovery.

Defendants ask the Court to disregard portions of the declarations submitted by Mr. Rhodes, because he was not listed as a witness as required by Fed. R. Civ. P. 26(a) or (e). "Counsel can be competent to provide an affidavit in support of a motion for summary judgment." *Moore v. Fargo Police Dep't*, 297 Fed. App'x 569, 569 (2008). *See e.g. Sitts v. United States,* 811 F.2d 736, 741–42 (2d Cir.1987) (the city's attorney attested that she

personally conducted a thorough and diligent search of the records of the police department, and it was not plainly erroneous for the district court to presume that the attorney for the city was familiar with the city's police files); *In re Apex Exp. Corp.,* 190 F.3d 624, 635 (4th Cir.1999) ("We have held in the Rule 56(e) context that ordinarily, officers would have personal knowledge of the acts of their corporations.") (internal quotation omitted); *Lockwood v. Wolf Corp.,* 629 F.2d 603, 611 (9th Cir.1980) (holding that where "the attorney negotiated the settlement and handled all the related transactions," it was "reasonable to assume that he had personal knowledge" of whether payment was received by his client).  Attorney affidavits not based upon personal knowledge, however, have been held not to comply with Rule 56(e). *Postscript Enterprises v. City of Bridgeton*, 905 F.2d 223, 226 (8th Cir. 1990).  "It is the Court's job to eliminate from consideration any argument, conclusions, and assertions unsupported by the documented evidence of record."  *Asarco LLC v. NI Industries, Inc.*, 106 F.Supp.3d 1015, 1032 (E.D. Mo. 2015).

Although at times Mr. Rhodes' characterizations of the exhibits attached to his declarations may not be admissible, the exhibits that were produced by the parties have already been authenticated and the discovery materials speak for themselves.  "The act of production is an implicit authentication of documents produced."  *See Hammer v. JP's Southwestern Foods, LLC*, No. 08-0339-CV-W-FJG, 2014 WL 2759089, at *2 (W.D.Mo. June 18, 2014) (citations omitted); *see also Orr v. Bank of America, NT & SA*, 285 F.3d 764, 776 (9th Cir. 2002) ("[W]hen a document has been authenticated by a party, the requirement of authenticity is satisfied as to that document with regards to all parties.").  The Court will consider Mr. Rhodes' declarations to the extent they can assist the Court in determining whether there is a genuine issue of material fact as appropriate.

**C.      Defendants' Affidavits and Missouri Sunshine Law Requests**

On December 29, 2014, before this action was filed, Mr. Rhodes submitted a Missouri "Sunshine Law" request to the Custodian of Records of the St. Charles County Sheriff's Department seeking several documents.  One of the requests sought "all training materials used to provide training to the SWAT Team members who were called out that day [August 13, 2014] relating to civil disturbances."  [Doc. 57-6 at 15.]  Ms. Ragan responded, "For your information, these materials were created after August 13, 2014, but there are no earlier records that respond to your request." [Doc. 57-6 at 51.]   In support of their Motion for Summary Judgment, Defendants submitted the affidavits of former St. Charles County Sheriff Thomas Neer and Lieutenant Timothy MacMann that indicate that the St. Charles County SWAT Team engaged in nine trainings for field force "civil disobedience" training between November 6, 2006 and January 22, 2014.  Defendant Deputy Michael Anderson also averred that he attended three field force "civil disobedience" trainings between October 2010 and January 2014.  Defendants also supplemented their Rule 26(a) disclosures in October 2017 to name Sheriff Neer as a witness. Plaintiffs assert that Defendants are bound by their earlier Sunshine law response that no training materials existed before the date of the alleged incident at issue.

Section 610.011.2 of the Missouri Open Records Act or the "Sunshine Law" provides that all public records of public governmental bodies shall be open to the public for inspection and copying as set forth in § 610.023 to § 610.026, except as otherwise provided by law.  In interpreting this provision of law and all other provisions of Chapter 610, § 610.011 reads in pertinent part:  It is the public policy of this state that meetings, records, votes, actions, and deliberations of public governmental bodies be open to the public unless otherwise provided by law....Mo. Rev. Stat. § 610.011.1; *see also* § 610.011.2 ("Except as otherwise provided by law,

all public meetings of public governmental bodies shall be open to the public as set forth in section 610.020, all public records of public governmental bodies shall be open to the public for inspection and copying as set forth in sections 610.023 to 610.026, and all public votes of public governmental bodies shall be recorded as set forth in section 610.015."); § 610.023 ("Each public governmental body shall make available for inspection and copying by the public of that body's public records.").

Defense counsel's allegedly erroneous or misleading response to the Sunshine Law request may provide Plaintiffs with a cause of action against Defendants under the Missouri Sunshine Law.  For the purposes of the summary judgment motion, however, the affidavits of Sheriff Neer, Lieutenant MacMann, and Deputy Anderson can be considered by the Court, including their attestations regarding the training received by the SWAT team members.

## D.      Undisputed Facts for Summary Judgment Purposes

The Court finds that the following facts are material and undisputed for purposes of Defendants' Motions for Summary Judgment.[1]

In 2014, Michael Anderson was a deputy with the St. Charles County Police Department and had been a member of the St. Charles County Regional SWAT Team since 2010.  Following the fatal shooting of Michael Brown in Ferguson, Missouri, on August 9, 2014, there was significant public outcry and protests, and there was a large police response.  The St. Louis County Police had assumed overall command of the police response in Ferguson.  St. Louis County requested assistance from the St. Charles County Regional SWAT Team in Ferguson,

---

[1] The facts listed are undisputed by the parties or supported by appropriate citations to the record as required by Local Rule 4.01(E).  The Court has not considered any affidavits not based on personal knowledge, any evidence not supported by citation to the record, or inadmissible hearsay.  *See e.g. Brooks v. Tri-Systems, Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005) (when an affidavit contains an out-of-court statement offered to prove the truth of the statement that is inadmissible hearsay, the statement may not be used to support or defeat summary judgment).  Further, the Court has not included conclusory factual or legal statements or opinions in this fact section.  *See Quinn v. St. Louis County*, 653 F.3d 745, 751-52 (8th Cir. 2011) (plaintiff needed to explain the legal significance of her factual allegations beyond mere conclusory statements importing the appropriate terms of art).

including on August 13, 2014.  The St. Charles County Regional SWAT Team had also been in Ferguson on Sunday, August 10th and Tuesday, August 12th.

On August 13th, there were multiple law enforcement agencies present, including from the St. Louis County Police Department, the Missouri State Highway Patrol, the St. Louis Metropolitan Police Department, the Ferguson Police Department, and officers from a variety of other municipalities within St. Louis County.  Some law enforcement agencies' officers could be identified as a member of that agency by distinctive uniforms or patches, but others could not, especially after dark and when most law enforcement officers were wearing gas masks.  On August 13, 2014, the Captain of the Bureau of Special Enforcement and the St. Charles County SWAT Team Commander received a briefing at the Command Post, at Buzz Westfall Plaza.  On August 13, 2014, the St. Charles County Regional SWAT Team was given its assignment, which was to assist St. Louis County and the Highway Patrol with crowd control on West Florissant Avenue.

On August 13, 2014, the Al Jazeera America television news network sent journalists, including Plaintiffs Ash-har Quraishi, Marla Cichowski, and Sam Winslade to Ferguson. Plaintiffs set up cameras to prepare for a broadcast live from Ferguson.  The cameras were set up at Highmont Drive and Gage Drive.  Plaintiff Winslade began recording at 9:24 p.m.  Members of the St. Charles County Regional SWAT Team approached the intersection of West Florissant Avenue and Highmont Drive shortly before 9:30 p.m. and by that time it was dark outside.  The Plaintiffs observed police officers a block and a half away, at the intersection of West Florissant Avenue and Highmont Drive.

The Al Jazeera America video camera captures unedited raw footage of what happens next.  Quraishi begins preparing for the live broadcast speaking to Winslade and Cichowski

among others.  Within a few minutes, an unidentified police officer shot rubber bullets at Plaintiffs.  Within a minute, Deputy Anderson deployed a single round of CS gas, and it landed in front of Plaintiffs' cameras where Plaintiffs were standing.  The actual CS canister did not come into physical contact with the Plaintiffs.  The tear gas canister detonates, and then the Plaintiffs move off camera, but can be heard talking about being shot at by police.  Quraishi called 911, and Winslade called the Al Jazeera America Network Operations Center and asked them to call the St. Louis County Police.  Someone off camera stated that a floodlight was shining on them.  Then, an unidentified person walked past the camera and crossed the street.  Some cars drove slowly down the street.  Within two minutes, a group of young people began posing in the camera, stating that they believed they were live on CNN and commenting that the police scared the news reporters away.  Within thirty seconds, Quraishi came into the camera's view and is shot at again and he immediately left the camera's line of sight.  Another individual walked down the street past the camera.  Then, a second group of people began taking pictures and talking into the camera for over two minutes.  There is distant yelling and remote noise in the background.  At the sixteen minute mark on the video recording, some young men who were walking on the opposite side of the street come to the corner, stop, and talk.  Within twenty seconds, tear gas is shot in their direction and they disperse.  At the seventeen minute mark, the St. Charles County Regional Swat Team's Bearcat[2] comes into view with a bright light shining at the top.  There is a muffled sound that appears to sound like "turn the spotlight off."  The announcement is made a few times and the Bearcat leaves the camera's view.

Then, the St. Charles County Regional SWAT Team Bearcat turned left onto Highmont and drove west to the area where Plaintiffs had set up their lights and camera equipment.  Three members of the St. Charles County Regional SWAT Team exited the Bearcat with one team

---

[2] A Bearcat is an armored transport vehicle used by the military and some law enforcement agencies.

member serving as a cover while the other two handled the equipment.  They first attempted to turn the lights off but were unable to quickly do so.  The officers then laid the lights on the ground and turned the camera lens to the ground.  The officers returned to the Bearcat.  The members of the St. Charles County Regional SWAT Team heard on the radio that there was a "possible news crew that might be in some kind of danger near Highmont and Ward."  The officers in the Bearcat then continued west of Highmont toward the Plaintiffs, who came out of hiding to talk to the officers.  The parties then dispute whether Plaintiffs voluntarily entered the Bearcat with officers or were ordered to do so at gunpoint.  This encounter was not captured on video.  Approximately five minutes later, the Plaintiffs return to their equipment, packed up their equipment, and left the area, as they were ordered to do by the police.  The police officers instructed them, "you guys need to hurry up and get out of here."

On August 14, 2014, St. Charles County released an official statement, which read as follows:

> Over the last few days, the St. Charles County Regional SWAT Team has assisted in Ferguson at the request of the St. Louis County Police Department to help respond to looting and for protection of the property of Ferguson citizens and businesses.  On Wednesday, August 13th, video footage was taken of St. Charles County SWAT officers handling media camera equipment.  The position of the St. Charles County Sheriff's Department is that the media has the right to cover these events and supports the freedom of the press, and the SWAT Team has not been any part of attempting to prevent media coverage.  In fact, last night SWAT Team officers were assisting the media in moving their camera equipment and media personnel to a safer area with their consent so that they could continue to cover the event.  The Sheriff has notified St. Louis County Police that the St. Charles County Regional SWAT Team is available to protect life and property but does not have a continued role in crowd control during this time of civil protest.

Brandon Jones, a medic for the St. Charles County Regional SWAT Team, carried his personal GoPro video camera with him on August 13, 2014, while deployed with the SWAT Team.  The County Defendants have produced 16 video recordings taken by Jones that night, numbered 091 through 105 and 108.  The County Defendants stated that they do not have videos labeled 106 and 107 or any of the original videos.

During all times relevant to Plaintiffs' allegations, Deputy Anderson was not a final policymaker with respect to the police response on or near West Florissant Avenue where Plaintiffs allege force was used against them.  St. Charles County's insurance policy covering tort claims expressly states that it does not constitute a waiver of any sovereign or governmental immunity under sections 71.185 or 537.610 of the Missouri Revised Statutes.

### E.     Claims against Deputy Anderson in his individual capacity

Plaintiffs' claims against Deputy Anderson focus his firing tear gas at them while they were reporting on the events in Ferguson on August 13, 2014.

#### 1.     First Amendment Claim

Deputy Anderson asserts that Plaintiffs fail to state a violation of their First Amendment rights.  The First Amendment to the United States Constitution states, "Congress shall make no law … abridging the freedom of speech or of the press, …"  U.S. Const. amend. 1.  "The liberty of speech and of the press which the First Amendment guarantees against abridgment by the federal government is within the liberty safeguarded by the due process clause of the Fourteenth Amendment from invasion by state action."  *First Nat. Bank of Boston v. Belotti*, 435 U.S. 765, 779 (1978).  Speech on public issues "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."  *Connick v. Myers*, 461 U.S. 138, 145 (1983).  "Official reprisal for protected speech offends the Constitution because it threatens to

inhibit exercise of the protected right … and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions … for speaking out." *Hartmann v. Moore*, 547 U.S. 250, 256 (2006).  To successfully assert a First Amendment retaliation claim, Plaintiffs must show (1) they engaged in a protected activity, (2) the government official took adverse action against them that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise in the protected activity.  *Greenman v. Jessen*, 787 F.3d 882, 892 (8th Cir. 2015).  Anderson contends that the Plaintiffs cannot meet the first and third prongs.

First, Anderson asserts that Plaintiffs were not engaged in protected activity.  Anderson identifies Plaintiffs' activity as being in the vicinity of bright lights where officers believed people were violating the law, and that such activity is unprotected.  Anderson's contention is absurd.  News gathering qualifies for First Amendment protection.  Plaintiffs are journalists from the former Al Jazeera America television news network.  Plaintiffs were reporting on civil unrest and police activity at the time they were tear gassed.  Plaintiffs were recording footage at the time of the incident.  These are uncontroverted facts.  News gathering qualifies for First Amendment protection.  "[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972).  Anderson cannot make a serious argument that journalists actively reporting a news event are not engaged in protected activity.  The fact that Plaintiffs were engaged in protected activity is beyond dispute.

Anderson concedes that the deployment of tear gas against Plaintiffs is adverse action, which would chill a person of ordinary firmness from continuing in the activity, in this case newsgathering.  Therefore, the crux of Plaintiffs' First Amendment claims hinges on the third prong.  The third prong concerns whether the adverse action was motivated at least in part by

exercise in the protected activity.  Plaintiffs must show that the retaliatory motive of the officer was a substantial factor or but-for cause of the adverse action.  *Hoyland v. McMenomy*, 869 F.3d 644, 657 (8th Cir. 2017).  "The causal connection is generally a jury question, but it can provide a basis for summary judgment when the question is so free from doubt as to justify taking it from the jury."  *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004).  Therefore, plaintiffs must demonstrate, that there, is at a minimum, some doubt as to causal connection.

The Court finds that Anderson has failed to show that he is entitled to judgment as a matter of law on this claim.  There are significant and multiple genuine issues of material fact present in this case.  The parties' versions of the tear gassing vary widely.  Further, the video recordings of the incident, from various vantage points, raise doubt about Deputy Anderson's version of events.  Deputy Anderson avers

> While we were at the intersection of West Florissant Avnue [sic] and Highmont Drive, I observed projectiles that appeared to be rocks coming from the area of the bright lights, and a glass bottle thrown from that direction broke at my feet.  The bright light made it difficult for me to determine exactly from where the projectiles were being thrown, to assess how many individuals were in the area, or to determine the magnitude of the threat at that location.  I heard announcements from a member of the St. Charles County Regional SWAT Team and St. Louis County to turn off the lights, but the lights remained on.  While we were at the intersection of West Florissant Avenue and Highmont Drive, I believed that there were imminent threats to my safety and to the safety of others in the area in a large part because of the lights shining on us. … I was instructed by Sergeant Juengst of the St. Charles County Regional SWAT Team to deploy a round of CS gas to the area in front of the bright lights, and I did.  I placed the round of CS gas in front of the bright lights [sic] order to minimize risk to individuals in the area from being hit by the canister.

Anderson Aff. [Doc. 53-4.]

13

There are at least three video recordings of the scene at West Florissant Avenue and Highmont Drive at the time that shots were fired, and tear gas was thrown at Plaintiffs.  The videos more closely align with Plaintiffs' version of events.  The videos depict a calm scene that is suddenly interrupted by gunfire and tear gas directly targeting Plaintiffs.  Before the shooting and tear gas, the only noises heard on the audio were overhead helicopters and police appearing to apprehend someone down the street.  Periodically, there were people peacefully and slowly walking down the street.  There are cars driving down the street.  The videos depict a quiet residential neighborhood.  None of the audio recordings capture any announcements "to turn off the lights" before the shooting and tear gas is deployed.  Al Jazeera America's recorded footage shows several minutes before and after the shooting and gassing of the Plaintiffs.  Interestingly, Deputy Anderson and the other officers attest that they believed that projectiles were being thrown from behind the "bright lights" and they feared for their safety.  None of the videos show any projectiles being thrown, including the raw footage from Al Jazeera's camera.  The raw footage from Al Jazeera, however, showed that numerous people came into the area where the reporters were standing, but only the reporters were shot at and tear gassed.

The Court also notes that Defendants repeatedly mischaracterize Winslade's deposition testimony and cite to a Fox News online news article alleging that Winslade told a reporter that "because of our light it was hard for them to see."  Defendants' quote from the article is misleading.  The full quote from the article is as follows:  "'I felt like it was intentional; I feel we were targeted,' Winslade said on Monday.  'We were very clear that we were media.  But, because of our light, it was hard for them to see.  They could see that we clearly were not protestors, however.'"  [Doc. 76-3 at 14.]  In Winslade's deposition testimony, he repeatedly states that he does not recall the article or what he said to the reporter.  In their briefing,

Defendants repeatedly maintain that Winslade "admitted that because of our light, it was hard for them [police officers] to see.  Defendants' characterization is misleading and not supported by evidence in the record.  The news article produced by Defendants is hearsay.  *Nooner v. Norris*, 594 F.3d 592, 603 (8th Cir. 2010) (citing *Miller v. Tony & Susan Alamo Found.,* 924 F.2d 143, 147 (8th Cir.1991)) ("Newspaper articles are rank hearsay.").  The online news article cannot be used to prove the truth of the matter Defendants assert, that Winslade admits that the lights made it hard for the police to see.  *Nooner*, 594 F.3d at 603 (citing *United States v. Santisteban*, 501 F.3d 873-878-79 (8th Cir. 2007)).  Therefore, the Court will not consider this evidence as an admission of a party opponent.

The Court is sensitive to the fact that videos may not capture the full scene.  Also, the fact that the audio does not capture an announcement from police before the shooting or tear gas deployment does not mean that the police did not make the announcement.  Maybe the announcement was made at such a low volume that no one heard it but the police.  In any event, Anderson's defense is that he had a right to deploy tear gas because of suspected criminal activity and his belief that there were imminent threats to his safety and others due to a bright light shining on them.  Plaintiffs' affidavits, other witnesses' affidavits, and the video evidence do not support his contention.  Defendants have a still shot photograph taken by their medic Brandon Jones identifying a "bright light" as the light from the Plaintiff's camera.  As with Plaintiffs' testimony and videos, Defendants' still shot could also be interpreted in more than one way by a jury.  The Court must consider the totality of circumstances as they existed at the time of the incident.  Therefore, because the evidence is viewed in the light most favorable to the Plaintiffs, the Court cannot grant summary judgment in favor of Anderson on Plaintiffs' First Amendment claims.

## 2.      Fourth Amendment Claim

Next, Plaintiffs assert that Deputy Anderson illegally "seized" them in violation of the Fourth Amendment when he fired a 40 mm CS round of tear gas from his grenade launcher directly at Plaintiffs intending to terminate or restrain their freedom to remain in their location and continue their newsgathering and reporting.  (Compl. ¶ 280.)  Deputy Anderson claims that Plaintiffs' claim for violation of their Fourth Amendment rights fail to state a claim, because Plaintiffs cannot show that the use of the tear gas was excessive, and it did not violate the Fourth Amendment.

The Fourth Amendment states that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched and the person or things to be seized."  U.S. CONST. amend. IV.  "To establish a violation of the Fourth Amendment in a section 1983 action, the claimant must demonstrate a seizure occurred and the seizure was unreasonable."  *McCoy v. City of Monticello,* 342 F.3d 842, 846 (8th Cir. 2003) (citing *Hawkins v. City of Farmington,* 189 F.3d 695, 702 (8th Cir.1999)).  "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer by means of physical force or show of authority, terminates or restrains his freedom of movement … through means intentionally applied."  *Brendlin v. California*, 551 U.S. 249, 254 (2007).  "A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned."  *Id.*

"[Not] every police officer act that results in a restraint on liberty necessarily constitutes a seizure, rather the restraint must be effectuated through means intentionally applied." *Moore v. Indehar*, 514 F.3d 756, 759-60 (8th Cir. 2008).  "A seizure occurs if 'in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave' …but 'when a person has no desire to leave for reasons unrelated to the police presence, the coercive effect of the encounter can be measured by asking whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'" *Brendlin*, 551 U.S. at 255.  "The Supreme Court in *Brendlin* … explained that the intent that counts under the Fourth Amendment is the intent that has been conveyed to the person confronted." *Gardner v. Board of Police Comm'rs Kansas City, Missouri*, 641 F.3d 947, 951 (8th Cir. 2011) (citing *Brendlin*, 551 U.S. at 260-61.)

"Reasonableness of a seizure is determined by the totality of circumstances and must be judged from the viewpoint of a reasonable officer on the scene, irrespective of the officer's underlying intent or motivation." *McCoy*, 342 F.3d at 848.  The reasonableness of force depends on the facts and circumstances of each case accounting for the severity of the crime at issue, whether the suspect poses an immediate threat to safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *McCoy*, 342 F.3d at 848 (citing *Graham*, 490 U.S. at 396-97).  "Whether an officer's use of force is reasonable is judged from the perspective of a reasonable officer on the scene, rather than with 20/20 hindsight." *Graham*, 490 U.S. at 396.

Firing tear gas, pepper spray, or other chemical agents at someone can constitute a seizure under the Fourth Amendment. *See Young v. County of Los Angeles*, 655 F.3d 1156, 1161-63 (9th Cir. 2011); *Berndal v. Johnson*, No. 13 CV 06726, 2014 WL 4976212 at *4 (N.D.

Ill. Sept. 25, 2014); *Bettencourt v. Arruda*, No. 10-11487-JGD, 2012 WL 5398475 at *7-8 (D. Mass. Nov. 1, 2012); *Hamilton v. City of Olympia*, 687 F.Supp.2d 1231, 1241 (W.D. Wash. 2009); *Logan v. City of Pullman,* 392 F.Supp.2d 1246, 1259-60 (E.D. Wash. 2005).  The Court finds in this case that firing the tear gas at Plaintiffs constituted a seizure and it was unreasonable.  The Eighth Circuit has previously found that the deployment of chemical agents against unarmed, compliant suspects is a violation of the Fourth Amendment.  *See Peterson v. Kopp*, 754 F.3d 594, 600 (8th Cir. 2014) (police pepper spraying non-violent, non-resistant misdemeanant constituted excessive force).  Therefore, it would obviously be unreasonable for the police to deploy tear gas against non-violent individuals who are also not committing a crime.  Deputy Anderson contends the use of force was reasonable because projectiles were being thrown from the area of Plaintiffs' lights and he asks the Court to find the facts in favor of his version of events.  There is video evidence that at a minimum, shows that there is a genuine dispute whether there were people throwing projectiles at police from behind Plaintiffs' bright lights, whether a dispersal order given, and that Plaintiffs refused to disperse.  On summary judgment briefing, the Court cannot favor a defendant's version of events when there is no evidence that places the facts beyond question in his favor.  *Revels*, 382 F.3d at 876.  Therefore, the Court finds that Plaintiffs' claims can survive summary judgment.

### 3. Qualified Immunity

Next, Anderson alleges that even if the Court finds that a constitutional violation occurred, he is entitled to qualified immunity.  "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457

U.S. 800, 818 (1982)).  "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* at 231.  "A state official will be shielded by qualified immunity if (1) the plaintiff fails to allege or show that the official's conduct violated a constitutional right or (2) the constitutional right was not 'clearly established' at the time of the official's alleged misconduct." *Duffie v. City of Lincoln*, 834 F.3d 877, 882 (8th Cir. 2016).  It is within the Court's discretion to select which inquiry to address first.  *Pearson*, 555 U.S. at 236.

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015).  Clearly established law should not be defined at a high level of generality. *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).  The clearly established law must be particularized to the facts of the case.  *White v. Pauley*, 137 S.Ct. 548, 552 (2017).  The legal precedent must have a sufficiently clear foundation in then-existing precedent. *Johnson v. City of Minneapolis*, 901 F.3d 963, 971 (8th Cir. 2018).  Outside of an obvious constitutional violation, the Court is required to identify a case where an officer acting under similar circumstances was held to have violated a constitutional right.  *Id.*  "This is not to say that an official action is protected by qualified immunity unless the very action has been previously held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).  The case does not need to be directly on point.  *Johnson*, 901 F.3d at 971.  Existing precedent, however, must have placed the constitutionality of the officer's conduct beyond debate.  *District of Columbia v. Wesby*, 138 S.Ct. 577, 589 (2018).  "Qualified immunity protects all but the plainly incompetent who

knowingly violate the law." *Bernini v. City of St. Paul*, 665 F.3d 997, 1005 (8th Cir. 2012) (citing *Ashcroft*, 563 U.S. at 743).

The Court evaluates the defense of qualified immunity from the perspective of a reasonable police officer based on facts available to the officer at the time of the alleged constitutional violation. *Ransom v. Grisafe*, 790 F.3d 804, 811 (8th Cir. 2015). "When summary judgment is sought on a qualified immunity defense, the court inquires whether the party opposing the motion has raised any triable issue barring adjudication." *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011). "At the summary judgment stage, granting qualified immunity is not appropriate where … a dispute remains regarding facts material to the qualified immunity issue." *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1212 (8th Cir. 2013).

The First Amendment right to gather the news was clearly established at the time that Deputy Anderson deployed the tear gas. *Branzburg*, 408 U.S. at 681. First Amendment protection over newsgathering ensures that the government does not violate the First Amendment by deterring news sources from communicating information. *Houchins v. KQED, Inc.*, 438 U.S. 1, 10–12 (1978) (citing *Branzburg v. Hayes,* 408 U.S. at 680). Defendants are hard pressed to show that in 2014, a reasonable police officer would not know that shooting a tear gas canister at law abiding journalists engaged in newsgathering is an obvious constitutional violation. *Johnson*, 901 F.3d at 971. Although the parties dispute the facts, the evidence before the Court viewed in favor of the Plaintiffs contradicts the officers' recitation of events. It is the province of the jury to assess the credibility of the evidence, and if the jury accepts the Plaintiffs' version of events, it could fairly conclude that Deputy Anderson violated their First Amendment rights. *Brown v. City of Golden Valley*, 574 F.3d 491, 500 (8th Cir. 2009).

The Court also finds that Anderson is not entitled to qualified immunity on Anderson's Fourth Amendment claims.  It is "clearly established that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest and pose little or no threat to the security of the officers or the public."  *Brown*, 574 F.3d at 499.  Similar to the First Amendment claim, there are genuine disputes of material fact that can only be resolved by a jury in evaluating Plaintiffs' Fourth Amendment claims.  Therefore, the Court finds that granting qualified immunity is not appropriate, because there are significant disputes regarding material facts precluding summary judgment for Plaintiffs' First and Fourth Amendment claims against Anderson.  Further, Plaintiffs have also properly alleged with supporting evidence that they suffered a violation of their constitutional rights, which were clearly established at the time of the incident on August 13, 2014.

### 4.    Battery Claims

Deputy Anderson then asserts that Plaintiffs' claim against him for battery fails because they are unable to prove the required elements for battery and because official immunity applies.  Plaintiffs respond that Deputy Anderson used excessive force and official immunity does not apply.

Under Missouri law, battery includes the unlawful touching or striking of the person of another by the aggressor himself done with the intention of bringing about harm where the contact is not otherwise privileged and where the contact is not consented by the other person."  *Wilson v. City of Hazelwood*, 530 F.Supp.2d 1059, 1067 (E.D. Mo. 2007).  "The Missouri doctrine of official immunity 'protects public employees from liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary acts.'"  *Kasiah v. Crowd Sys., Inc.*, 915 F.3d 1179, 1185 (8th Cir. 2019) (quoting

*Southers v. City of Farmington*, 263 S.W.3d 603, 610 (Mo. banc 2008)).  "This protection is available unless the employees' conduct is willfully wrong or done with malice or corruption." *Id.*  Official immunity doctrine also applies when plaintiffs bring suit for certain intentional torts like assault and battery."  *Id.*  "The official immunity doctrine, however, does not provide public employees immunity for torts committed when acting in a ministerial capacity."  *Southers*, 263 S.W.3d at 610 (citing *Kanagawa v. State*, 685 S.W.2d 831, 835 (Mo. banc 1985) (overruled on other grounds).

"A police officer has the benefit of official immunity."  *Boude v. City of Raymore, Missouri*, 855 F.3d 930, 935 (8th Cir. 2017) (citing *Fonseca v. Collins*, 884 S.W.2d 63, 66 (Mo. Ct. App. 1994)).  "Discretionary acts require 'the exercise of reason in the adaptation of means to an end and discretion in determining how or whether an act should be done or course pursued."  *Boude*, 855 F.3d at 935.  "An officer's decision to use force in the performance of his duties is discretionary."  *Id.*

Plaintiffs assert that Deputy Anderson acted with malice, therefore, official immunity does not apply.  "Official immunity is lost if the official acted in bad faith or with malice, which ordinarily requires actual intent to cause injury."  *Boude*, 855 F.3d at 935.  "A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another."  *Id.* (citing *State ex rel Twiehaus v. Adolf*, 706 S.W.2d 443, 447 (Mo. 1986) (en banc)).  "Bad faith means dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive, or ill will partaking of the nature of fraud."  *Boude*, 855 F.3d at 935.  "In Missouri, a bad faith allegation survives summary judgment if a plaintiff states facts from which it could reasonably be inferred that defendant acted in bad faith or from an improper

or wrongful motive."  *Id.*  The allegations in Plaintiffs' First Amended Complaint that Deputy

Anderson tear gassed them when neither  Plaintiffs or anyone around them were engaged in or

about to be engaged in any illegal activity or that they or anyone around them were obstructing

or about to obstruct law enforcement officers in the performance of their duties meet this

standard.  Viewing the evidence as detailed above in the light most favorable to Plaintiffs, the

Court finds that Plaintiffs state facts where it can be reasonably inferred that Anderson acted in

bad faith.  There is a genuine dispute of material fact regarding Anderson's intent; therefore, this

claim must go before a jury.  The Court will deny Anderson's request for summary judgment on

Plaintiffs' battery claim and deny the request for official immunity.

**F.**     **Fourteenth Amendment Claims**

In Counts III and IV, Plaintiffs assert a Fourteenth Amendment claim for violation of

their right to due process regarding Anderson's deployment of tear gas at them.  Plaintiffs assert

that the tear gassing of individuals committing no crime violates their substantive due process

rights.  Plaintiffs presented this claim as an alternative to its Fourth Amendment claims, if the

Court did not find that the tear gassing was a seizure.

> [*All*] claims that law enforcement officers have used
> excessive force—deadly or not—in the course of an arrest,
> investigatory stop, or other "seizure" of a free citizen should
> be analyzed under the Fourth Amendment and its
> "reasonableness" standard, rather than under a "substantive
> due process" approach. Because the Fourth Amendment
> provides an explicit textual source of constitutional
> protection against this sort of physically intrusive
> governmental conduct, that Amendment, not the more
> generalized notion of "substantive due process," must be the
> guide for analyzing these claims.

*Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original).  The standard to establish a

substantive due process violation is extremely high.

23

> To establish a violation of an individual's substantive due process rights, the "plaintiff 'must demonstrate *both* that the official's conduct was conscience-shocking, *and* that the official violated one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.

*Norris v. Engles*, 494 F.3d 634,637-38 (8th Cir. 2007) (emphasis in the original).  Because the Court has found that Plaintiffs' claims are best reviewed under the First and Fourth Amendment jurisprudence, the Court will grant Defendants' motions for summary judgment on these Fourteenth Amendment claims.

### G.    St. Charles County Municipal Claims

#### 1.    Punitive Damages

Plaintiffs concede that St. Charles County is entitled to summary judgment on their punitive damages claims against the County.  Therefore, the Court will enter judgment in favor of St. Charles County on Plaintiffs' punitive damages claims.

#### 2.    Unconstitutional Policy, Custom, or Practice

Plaintiffs allege that St. Charles County's failure to train the members of the St. Charles County Sheriff's Department Regional SWAT Team resulted in a custom and practice or usage of violating the First and Fourth Amendment rights of citizens whenever the officer believed the citizen was challenging the authority of the officer.  Plaintiffs allege that the custom and practice led to the violation of their rights under the First and Fourth Amendments.

Title 42 U.S.C. § 1983 provides

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State … subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in

an action at law, suit in equity, or other proper proceeding
for redress.

"A municipality or other local government may be liable under this section if the governmental body itself 'subjects' a person to a deprivation of right or 'causes' a person to be subjected' to such deprivation."  *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citing *Monell v. New York City Dept. of Social Serv.*, 436 U.S. 658, 692 (1978)).  Local government liability is limited to acts that are their own illegal actions, they are not vicariously liable for their employees' actions. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479-80 (1986).

Federal courts recognize claims "challenging an unconstitutional policy or custom, or those based on a theory of inadequate training, which is an extension of the same."  *Marsh v. Phelps County*, 902 F.3d 745, 751 (8th Cir. 2018).  The first inquiry in any case alleging municipal liability under § 1983 "is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  *Marsh*, 902 F.3d at 752. "To prove the existence of a policy, a plaintiff must point to an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters."  *Id.* at 752.  "Further the plaintiff must prove that the policy was the moving force behind a constitutional violation."  *Id.*

"A municipal custom is a practice of municipal officials that is not authorized by written law, but which is so permanent and well-settled ... as to have the force of law."  *Russell v. Hennepin County*, 420 F.3d 841, 849 (8th Cir. 2005).  "To establish a constitutional violation resulting from a custom, a plaintiff must show that his alleged injury was caused by municipal employees engaging in a widespread and persistent pattern of unconstitutional conduct that municipal employees were either deliberately indifferent to or tacitly authorized."  *Russell*, 420 F.3d at 849.  "Deliberate indifference is a stringent standard of fault, requiring proof that a

municipal actor disregarded a known or obvious consequence to his action."  *Thompson*, 563 U.S. 51 at 61.

Plaintiffs do not cite to any official policies of St. Charles County.  Plaintiffs direct the Court's attention to three incidents involving the St. Charles County Police Department on August 13, 2014 to demonstrate a pattern and practice of abuse by the police.  The incidents identified by Plaintiffs are (1) the arrest of a woman who asked her son for CNN's business card, (2) the arrest of a St. Louis alderman who was recording police on his phone, and (3) the firing of rubber bullets at a local news crew recording an altercation between police officers and a man. The incidents cited by Plaintiffs occurred on the same day as the incident involving Plaintiffs. Although Plaintiffs present examples of three incidents, they fall far short of establishing evidence of a practice that is so permanent and well settled as to have the force of law.  Events that are substantially contemporaneous to the incident at issue do not establish that a widespread and persistent pattern exists.  Moreover, Plaintiffs cannot demonstrate that the municipality was the "moving force behind the injury alleged."  *See Board of County Com'rs of Bryn County, Okla. v. Brown*, 520 U.S. 397, 404 (1997).  Therefore, the Court will grant Defendant St. Charles County summary judgment on this claim.

### 3.    Failure to Train

The St. Charles County Regional SWAT Team Agreement, of which St. Charles County is a signatory, provides that the SWAT Team

> will respond to high risk law enforcement situations requiring extraordinary control and/or coordinated action by trained, specialized law enforcement personnel, including without limitations situations involving high risk warrants, barricade or hostage situations, 'VIP' protection details, civil disturbances, lost or missing persons (requiring an area search, or special details by participating police departments that have the approval of such department.

[Doc. 53-5 at 21-22, Doc. 57-6 at 103-104].  The signatories executed the Agreement in August 2013.  [Doc. 53-5 at 35-40, Doc. 57-6 at 117-22].  The Agreement stated that "Participating police departments agree to have their personnel participate in two (2) eight (8) hour training days per month to include without limitation firearms and tactics."  [Doc. 53-5 at 27, Doc. 57-6 at 109].  The SWAT Team was "under the supervision and control of the Sheriff's Department, Bureau of Special Enforcement."  [Doc. 53-5 at 21, Doc. 57-6 at 103].  St. Charles County states that the SWAT team received training in civil disturbances, called field force training, on November 6, 2006, November 22, 2006, November 21, 2007, September 10, 2010, December 21, 2009, October 8, 2010, December 16, 2011, December 21, 2012, and January 22, 2014. Deputy Anderson avers that he received "field force" training on civil disturbances on October 8, 2010, December 16, 2011, and January 22, 2014.

Defendants seek summary judgment on Plaintiffs' claims that a failure to adequately train its SWAT team members in civil disobedience and the rights of the news media to cover police activities.  "Municipal liability under § 1983 attaches-where- and only where- a deliberate choice to follow a course of action is made from among various alternatives by city policy makers." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989).  "Only where a failure to train reflects a deliberate or conscious choice by a municipality- a 'policy' … can a city be liable for such a failure under § 1983."  *Id.*  "In resolving the issue of a city's liability, the focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform." *Id.* at 390.  "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."  *Id.* at 390-91.  Finally, "it may happen that in light of the duties assigned to specific officers or employees, the need for more or different training is so obvious,

and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* at 390. "In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *Id.*

In this case, Defendants contend that (1) the SWAT Team received several years of civil disobedience training before the Ferguson unrest, (2) Plaintiffs cannot prove that there was a deliberate choice not to train SWAT team members, (3) Plaintiffs cannot show St. Charles County officials had knowledge of prior unconstitutional conduct, and (4) Plaintiffs cannot show any alleged deficiency in training actually caused the officer to deploy the tear gas. Plaintiffs assert that it was foreseeable that this SWAT team would be responding to civil disturbances at the time it was created, and it failed to provide that training. Plaintiffs also assert that the affidavits submitted by the County in support of its motion indicate a "complete lack of understanding of the rights of the news media to cover police activities." In this case, Plaintiffs have not presented any evidence that the SWAT Team's training was so inadequate to cause constitutional deprivation. The record on summary judgment does not support a claim for failure to train that would be actionable under § 1983. The Court will grant summary judgment to St. Charles County on this claim.

### Conclusion

For the foregoing reasons, the Defendants' Motion for Summary Judgment and Supplemental Motion for Summary Judgment are granted in part and denied in part. The Court will schedule a status conference to discuss a trial date for the claims that remain pending on July 11, 2019 at 11:00 a.m.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment and Supplemental Motion for Summary Judgment are **GRANTED in part** and **DENIED in part**. [Docs. 53, 76.]  Summary judgment is **GRANTED** in favor of St. Charles County on Counts II, IV, and VI and any claims of punitive damages against it in Plaintiffs' First Amended Complaint.  Summary Judgment is **GRANTED** in favor of Deputy Michael Anderson on Count III of Plaintiff's First Amended Complaint.  Summary Judgment is **DENIED** as to Counts I, V, and VII of Plaintiff's First Amended Complaint against Deputy Michael Anderson.

**IT IS HEREBY ORDERED** that a status conference to discuss scheduling a trial date on the remaining claims is set for July 11, 2019 at 11:00 a.m. in the courtroom of the undersigned.

A separate partial Judgment will accompany this memorandum and order.

NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE

Dated this 10th day of June, 2019.